Kimberly M. Schoene, Plaintiff Pro Se
1801 NW Upshur, Suite 100
Portland, OR 97209
(503) 713-7000
hissmallvoice@gmail.com

FILED 11 JUL '23 16:43 USDC-ORP

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **KIMBERLY M. SCHOENE,** | ) **CASE NO. 3:23-CV-00742-SI** |
| Plaintiff, | ) **FIRST AMENDED COMPLAINT** |
| vs. | ) |
| | ) **CLAIMS:** |
| **THE OREGON DEPARTMENT OF** | ) (1) Deprivation of Fifth and Fourteenth |
| **HUMAN SERVICES**, a government agency; | ) Amendment Right of Due Process; |
| **LINDA LAWING**, in her individual capacity | ) (2) Deprivation of First Amendment |
| and as a state employee; **ROBI TOBAR**, in | ) Right of Free Speech; |
| her individual capacity and as a state | ) (3) Intentional Infliction of Emotional |
| employee; **TONI HUGHES**, in her | ) Distress; |
| individual capacity and as a state employee; | ) (4) Negligent Infliction of Emotional |
| **MATTHEW KINTNER**, in his individual | ) Distress; |
| capacity and as a state employee; | ) (5) Negligence Against State; |
| **STEPHANIE CAMPBELL**, in her | ) (6) Negligence Per Se Against State; |
| individual capacity and as a state employee; | ) (7) Violations of ORS 418, 419B, OAR |
| **SAUL VENCES**, in his individual capacity | ) (8) Violations of 42 USC 5101, et seq |
| and as a state employee; **ANDY PEREZ**, in | ) |
| his individual capacity and as a state | ) |
| employee; **SERENA DALE**, in her | ) |
| individual capacity and as a state employee; | ) **Prayer for Relief: $1,430,000** |
| **SHENA SCHRINER**, in her individual | ) |
| capacity and as a state employee; and **JANE** | ) **DEMAND FOR JURY TRIAL** |
| **and JOHN DOES 1-10**, in their individual | ) |
| and/or official capacities, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Plaintiff Kimberly M. Schoene ("Plaintiff" or "Schoene"), *pro se*, brings this action

against Defendants based on the following allegations:

[PAGE 2 OF **FIRST AMENDED** COMPLAINT FOLLOWS THE TABLE OF CONTENTS]

FIRST AMENDED COMPLAINT - TABLE OF CONTENTS

| SUBJECT | PG. |
|---|---|
| 1.  CAUSE OF ACTION; INTRODUCTION | 1 |
| 2.  JURISDICTION AND VENUE | 5 |
| 3.  SUBJECT MATTER JURISDICTION | 6 |
| 4.  THREE RELATED CASES | 6 |
| 5.  PARTIES | 7 |
| ADMINISTRATIVE INFORMATION | |
| 6.  OREGON TORT CLAIMS ACT NOTICE | 9 |
| 7.  NOTICE OF RIGHT TO SEEK PUNITIVE DAMAGES | 9 |
| 8.  DEMAND FOR TRIAL BY JURY | 9 |
| BACKGROUND INFORMATION | |
| 9.  PLAINTIFF – GENERALLY | 10 |
| 10. DEFENDANT DHS - GENERALLY | 11 |
| FACTS OF UNDERLYING CASE | 14 |
| 11. PLAINTIFF MEETS CHILD; WITNESSES AND REPORTS INJURIES TO DHS | 15 |
| 12. HOOD RIVER COUNTY OFFICIALS RETALIATE AGAINST & DEFAME PLAINTIFF UPON HER REPORTING OF INJURIES TO CHILD | 20 |
| 13. DHS INQUIRY INTO CHILD ABUSE TURNS INTO INVESTIGATION AGAINST PLAINTIFF FOR "MENTAL INJURY" | 24 |
| 14. CUSTODY TRIAL TESTIMONIES OF TWO INDEPENDENT MULTNOMAH COUNTY DHS CASEWORKERS INDICATE CHILD ABUSE & VINDICATE PLAINTIFF | 26 |
| 15. TESTIMONY OF MALEEA BRIGGS | 26 |
| 16. TESTIMONY MELISSA CACHO | 27 |
| 17. SMALL TOWN BIAS AGAINST PLAINTIFF: MISCONDUCT BY DHS | 28 |
| 18. DHS DECISIONS AGAINST PLAINTIFF BASED ON FLAWED INVESTIGATION; APPEAL BY PLAINTIFF & REVERSAL OF DECISION BY DHS | 34 |
| 19. DHS DID NOT ADVISE PLAINTIFF OF INVESTIGATION OR LEGAL RIGHTS | 41 |

FIRST AMENDED COMPLAINT - TABLE OF CONTENTS

| | |
|---|---|
| 20. HOOD RIVER POLICE REPORT & DHS DEFENDANT VENCES | 43 |
| 21. DA CARRIE RASMUSSEN RETALIATES AGAINST PLAINTIFF – FILES STALKING ACTION ON BEHALF OF MOTHER & DHS | 47 |
| 22. RECORDS NOT PROVIDED TO PLAINTIFF – DENIED DUE PROCESS BY DHS | 49 |
| 23. DHS VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS | 56 |
| 24. DHS VIOLATIONS OF OREGON LAW | 57 |
| 25. STATUS OF DHS ADMINISTRATIVE CASE IN WASHINGTON COUNTY | 61 |
| 26. INJURIES AND HARM TO PLAINTIFF CAUSED BY DEFENDANTS | 66 |
| 27. FEDERAL CAPTA PROGRAM / FUNDING / REQUIREMENTS / EVALUATION | 68 |
| 28. CAPTA REPORTING REQUIREMENTS & OVERSIGHT | 72 |
| 29. OREGON'S STATE PLAN AND ONGOING VIOLATIONS BY DHS/CPS | 75 |
| 30. ECONOMIC DAMAGES | 77 |
| **CLAIMS FOR RELIEF**<br>31. FIRST CLAIM FOR RELIEF: 42 USC §1983 - Deprivation Fifth and Fourteenth Amendment Right of Due Process | 80 |
| 32. SECOND CLAIM FOR RELIEF: 42 USC §1983 - Deprivation of First Amendment Right of Free Speech | 83 |
| 33. THIRD CLAIM FOR RELIEF: Intentional Infliction of Emotional Distress | 84 |
| 34. FOURTH CLAIM FOR RELIEF: Negligent Infliction of Emotional Distress | 86 |
| 35. FIFTH CLAIM FOR RELIEF: Negligence Against State | 88 |
| 36. SIXTH CLAIM FOR RELIEF: Negligence Per Se Against State | 90 |
| 37. SEVENTH CLAIM FOR RELIEF: Violations of Oregon Law and the State Plan by Defendant DHS | 91 |
| 38. EIGHTH CLAIM FOR RELIEF: Violations of CAPTA, 42 USC §5101, et seq | 98 |
| 39. PRAYER FOR RELIEF | 101 |

## CAUSE OF ACTION

1)      Plaintiff brings this action under 42 U.S.C. §1983 for deprivation of rights and privileges

secured by the First, Fifth and Fourteenth Amendments to the U.S. Constitution, for the denial of

her rights of free speech and due process by defendants, a governmental agency and employees

as agents of the governmental agency.

2)      Plaintiff also brings this action for intentional infliction of emotional distress, negligence

and intentional misrepresentation against defendants, seeking economic and non-economic relief.

3)      Plaintiff also brings this cause for violations by DHS of the mis-use of federal funding

that Oregon DHS received from the federal program that was enacted to grant funds to states in

order to help prevent and treat child abuse.

4)      DHS violated Oregon state law by not completing certain requirements that states must

fulfill, to be in compliance with federal law and reporting compliance, in order for a state

(Oregon) to be eligible for continued federal funding program through the federal Child Abuse

Prevention and Treatment Act ("CAPTA").

## INTRODUCTION

5)      In November 2018, Kimberly Schoene had recently met a 2-year-old boy (referred to as

"Child") who was the son of her (then) boyfriend Michael Allen ("Allen" or "Father"), and saw

that the boy had black eyes, repeatedly, and she reported it to DHS in early 2019.

6)      Over the next 2 years, DHS investigated the child abuse, which eventually turned into an

"investigation" against Plaintiff for "over-reporting" of child abuse and/or "over-documenting."

DHS' investigation found "mental injury" by Plaintiff to Child, and issued a written "Founded

Disposition" in May, 2021, and disallowed her to see Child.

7)      During the time Plaintiff reported the injuries, she gathered extensive background

documentation and information on the mother who was accused of committing the child abuse,

as to her criminal records, DHS records, police reports, other reports, and for Child as to medical records, therapy records, and other records. Plaintiff wanted to ensure everything she stated to public officials was supported by factual evidence, not her own opinion or that of Mr. Allen.

8)      Every injury Plaintiff reported to the DHS Hotline was based on "reasonable suspicion." Schoene sought the explanation(s) which did not match the injuries, and she took and submitted many photographs to DHS.

9)      Plaintiff appealed the DHS decision of mental injury and it was overturned; however, DHS issued a second decision finding "threat of harm" by Schoene to Child. Schoene appealed that DHS decision and DHS issued a final order with "threat of harm" against Schoene, upon which Schoene filed a petition for judicial review in Washington County Circuit Court on May 22, 2022, Case No. 22CV16664 (the "Washington County Case" or "DHS Admin. Case"). The Washington County Case is in active litigation, some discovery taken, trial date set for August 3, 2023 (with a motion to reset pending); DHS is represented by the Oregon Department of Justice, by the same attorney as this in proceeding, Mr. David Hall, Senior Assistant Attorney General, 100 SW Market St., Portland, OR 97201.

10)     Other entities besides DHS were involved in the assessment(s) of alleged child abuse, as well as the "investigation" into Plaintiff as to whether or not she was causing any harm to Child, which DHS adopted, which resulted in findings and conclusions against Plaintiff, to stop Plaintiff from reporting child abuse, and primarily to stop Plaintiff being outspoken against the lack of action by DHS for failure to stop the child abuse, or to investigate it properly, as DHS and locals in the Hood River legal community were protecting the mother of Child, under who's care the abuse had occurred, repeatedly.

11)     The actions by DHS caused severe emotional trauma to Schoene, as Schoene continues to fight against DHS in the Washington County Case, as well as a related lawsuit against the local

"children's advocacy center" who defamed Plaintiff and caused further emotional trauma to Schoene (known as Columbia Gorge Children's Advocacy Center or "CGCAC").

12)    Instead of addressing the truth Plaintiff gave to DHS (during the time she was reporting the injuries to Child and after), DHS turned against Plaintiff and accused her of "over-reporting" and "over-documenting" which both are ridiculous notions in themselves.

13)    Two "independent" DHS Caseworkers (from different offices in Portland), each looked into this matter and agreed that the many black eyes and bruising to Child was "founded" and the reporting by Plaintiff was reasonable, given the amount and frequency of the injuries.  One DHS Caseworker even described Hood River DHS office as *biased* in favor of Sanchez.

14)    The same two DHS Caseworkers who "independently" reviewed this matter, both from a different county (and each in a different office in Portland), both found the amount and frequency of the black eyes to be ***very concerning*** and they both justified the reporting by Plaintiff as reasonable.  (See "Custody Trial Testimony" section below.)

15)    One can review the sworn testimony of Malia Briggs and Melissa Cacho, in sworn court proceedings, and adjudge for themselves if Plaintiff acted within reason.  Both Ms. Briggs and Ms. Cacho agreed with what Plaintiff did was justified.

16)    There is never been an accusation against Plaintiff for stating false information, because she only presents the truth.  There have been many allegations and proof of lies and illegal practices from the Hood River County public officials, as shown in Plaintiff's filings with the OSB, against CGCAC in the lawsuit filed (Multnomah Co. Circ. Ct. No. 22CV09782), and tort claims notices.

## JURISDICTION AND VENUE

17)    The Court has jurisdiction of this civil action under 28 USC §§ 1331 and 1343(a), as this

action arises under the Civil Rights Act, 42 USC §§ 1983 and 1988; and, in part, 28 USC § 1332.

The Court also has supplemental jurisdiction under 28 USC §1367(a).

18)    This action is authorized and instituted under 42 U.S.C. § 1983 for deprivation of rights

and privileges secured by the U.S. Constitution, amendment numbers 1, 5 and 14.

19)    Jurisdiction of this Court is invoked under 28 U.S.C. § 1331, for a federal question, and

under 28 U.S.C. § 1332(a), because this action exceeds $75,000, and is between citizens of

different states.

20)    Plaintiff is a citizen and resident of the State of Oregon, whereas at least one defendant is

a citizen of another state for purposes of diversity.  Therefore, diversity of citizenship exists

under 28 U.S.C. § 1332(a)(1).

21)    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part of the events giving rise to the claim occurred in the area of Portland, Oregon, within the

jurisdictional boundaries of the United States District Court for the District of Oregon, Portland

division.

22)    Defendant DHS, and the individual defendants acting within the scope of their

employment, all acted under color of state law, as the agency for the State of Oregon chartered to

provide child protective services through the Department of Human Services, Defendant herein.

## SUBJECT MATTER JURISDICTION

23)     Jurisdiction for this case based on subject matter is in federal court because DHS accepts

federal funds through a federal program, and DHS has continuing violations of federal law by

not complying with the requirements of the federal program under which DHS receives federal

funding.  By acceptance of federal funds through a federal program and violating the federal law

under which the funding was created, the state waives state sovereign immunity.

24)     The US Supreme Court made an exception to Eleventh Amendment sovereign immunity

in *Ex Parte Young*, 209 U.S. 123 (1908), ruling a private litigant can bring suit in federal court

against a state officer (or agency) for relief, in order to end a continuing violation of federal law,

by declaring: *"[t]he State has no power to impart to him any immunity from responsibility to the

supreme authority of the United States."*  This First Amended Complaint alleges an ongoing

violation of federal law and seeks relief that is prospective.

25)     Here, as in *Lapides v. Bd. of Regents*, 535 U.S. 613 (2002), the US Supreme Court ruled

that when there are allegations of violations of state law and federal law: *"whether a particular

set of state laws, rules, or activities amounts to a waiver of the State's Eleventh Amendment

immunity is a question of federal law."*

## THREE RELATED CASES

26)     There are three (3) related cases referenced in this document, as follows:

    1) *State v. Schoene*, Hood River County no. 21CR37600 ("Stalking Action")

    2) *Schoene v. DHS, et al.*, Wash. Co. Cir. Ct. no. 22CV16664 ("DHS Admin. Case")

    3) *Schoene v. Rasmussen, CGCAC, et al*, Mult. Co. no. 22CV09782 ("CGCAC Case")

    Other cases also related: *Michael Allen v. Greta Sanchez*, Hood River Co. Cir. Ct. no.
    17DR22652 ("Custody Case"); DHS 343095: *In re Greta Sanchez* ("DHS No. 343095"); In
    Re [Child]; Hood River Co. Juv. Ct. no. 21JU00700

## PARTIES

27)    **PLAINTIFF KIMBERLY M. SCHOENE** ("Plaintiff") is and was a resident of the

State of Oregon, City of Portland and the County of Washington, at all material times. Plaintiff

Kimberly M. Schoene's place of business is and was in the State of Oregon, City of Portland and

the County of Multnomah.

28)    **THE OREGON DEPARTMENT OF HUMAN SERVICES ("DHS")** is an Oregon

agency.

29)    **DEFENDANT LINDA LAWING** ("Lawing") was a resident of the State of

Washington, and an employee of DHS, acting within the scope of her employment. Lawing was

a District 9 Child Protection Services ("CPS") Supervisor.

30)    **DEFENDANT ROBI TOBAR** ("Tobar") was an employee of DHS, acting within the

scope of her employment. Tobar was a District 9 CPS Supervisor.

31)    **DEFENDANT TONI HUGHES** ("Hughes") was an employee of DHS, acting within

the scope of her employment. Hughes was a District 9 CPS Supervisor.

32)    **DEFENDANT MATTHEW KINTNER** ("Kintner") was an employee of DHS, acting

within the scope of his employment. Kintner was a Hood River County CPS Supervisor.

33)    **DEFENDANT STEPHANIE CAMPBELL** ("Campbell") was an employee of DHS,

acting within the scope of her employment. Campbell was a Hood River County CPS

Caseworker.

34)    **DEFENDANT SAUL VENCES** ("Vences") was an employee of DHS, acting within the

scope of his employment. Vences was a Hood River County CPS Caseworker.

35)    **DEFENDANT ANDY PEREZ** ("Perez") was an employee of DHS, acting within the

scope of his employment. Perez was a Hood River County CPS Caseworker.

36)   **DEFENDANT SERENA DALE** ("Dale") was an employee of DHS, acting within the scope of her employment.  Dale was a DHS Office of Child Welfare Programs Child Safety Consultant**.**

37)   **DEFENDANT SHENA SCHRINER** ("Schriner") was an employee of DHS, acting within the scope of her employment.  Schriner was a DHS Office of Child Welfare Programs Child Safety Consultant.

38)   **DEFENDANTS JANE OR JOHN DOES 1-10** are caseworkers, supervisors, screeners, child protective services workers, child safety consultants, directors, officers, managers and others who engaged in constitutional deprivations, statutory violations and/or torts, and/or abetted and aided in the alleged constitutional deprivations, statutory violations and/or torts against Plaintiff.  Their true identities and the nature of their involvement remain unknown to Plaintiff, but will become known through discovery in this case.

39)   Defendant, the Oregon Department of Human Services was responsible for the delivery and administration of child safety services, and child abuse prevention, reporting, investigation, public awareness, rulemaking, etc. – all the duties at issue in this lawsuit.

40)   Defendant DHS, through other defendants named herein, failed to stop and/or prevent further child abuse to Child, after Plaintiff reported such abuse to the DHS Hotline.

41)   Defendant DHS, through the individual defendants named herein, conducted an investigation and made findings against Plaintiff that were erroneous, arbitrary and capricious, and severely damaged Plaintiff.

42)   DHS is liable under *respondeat superior* and through the Oregon Tort Claims Act for the acts and omissions of the individual Defendants.

43)   In the course of their respective employment relationships with DHS, all Defendants acted for and on behalf of one another and they are jointly and severally liable.

44)     DHS is split statewide into districts.  District 9 of DHS is for the counties of Wasco, Hood River, Sherman, Gilliam and Wheeler, headquartered in The Dalles.

## ADMINISTRATIVE INFORMATION
## OREGON TORT CLAIMS ACT NOTICE

45)     Plaintiff gave proper notice under the Oregon Tort Claims Act ("OTCA"), governed by ORS 30.275, by mailing a notice on or about October 27, 2021 to the defendants DHS, Lawing, Tobar, Hughes, Campbell, Vences, and Perez, within 180 days of the discovery of the alleged injury wherein these particular defendants were involved.

46)     Plaintiff further gave proper notice under the OTCA by mailing a notice on or about March 2, 2022 to defendants Dale and Schriner, and on June 10, 2022 to Defendant Kintner, within 180 days of the discovery of the alleged injury wherein these defendants were involved.

47)     In the notices, Plaintiff provided a description of the time, place and circumstances giving rise to the claim, so far as known to Plaintiff at the time, under ORS 30.275(4)(b).

48)     The State of Oregon denied all tort claims notices submitted by Plaintiff.

## NOTICE OF RIGHT TO SEEK PUNITIVE DAMAGES

49)     Pursuant to ORS 31.725(2) – This Complaint does not assert a claim for punitive damages.  However, Plaintiff is giving notice of intent to assert a claim for punitive damages in an amended complaint, and hereby asserts the notice of right to seek such punitive damages. Plaintiff will submit affidavits and documentation supporting the claim for punitive damages at the appropriate time.

## DEMAND FOR TRIAL BY JURY

50)     Pursuant to FRCP 38, Plaintiff demands a trial by jury.

## BACKGROUND INFORMATION

### PLAINTIFF – GENERALLY

51)     Kimberly M. Schoene was 47 years old when the events began in November 2018.

52)     Schoene is a vegetarian, has never used drugs, and never been pregnant.  All of these

contribute to her overall health and endurance, that are both above the norm.

53)     Schoene had tubal ligation at the age of 21, because she never wanted to have children.

54)     Before these events began Plaintiff did not have any interest in raising children, or being

a parent or caretaker for a child.

55)     Plaintiff has owned and operated a successful hair salon since 1999 under various names

and locations in the Portland area (the "Salon").

56)     Plaintiff has employed up to 25 employees at the same time, and over 50 employees as a

business owner, handling all "human resources" types of issues.

57)     Plaintiff also performs all the administrative duties, ordering supplies, etc.  In these

capacities she communicates often and regularly with clients, vendors, employees, and sub-

contractors for her business operations and for various projects in which she engages.

58)     Plaintiff is highly established in the hair salon industry, appearing on television and in

magazines, and working with celebrity clientele.  Her reputation is key to her economic success

because she is known as *"the best in Portland"* even having clients fly in from other states (and

Canada) for her services.

59)     Plaintiff documents all important business communications, financial documents, to have

an accurate record of what occurred.  Schoene uses this business tool in all administrative items,

to document or videotape events to ensure an accurate record of historical events.

60)     Before the events alleged herein, Plaintiff's mental health had been good, and she never

had any mental health or physiological issues related to stress.  Due to the actions alleged herein

by Defendants, Plaintiff suffered severe mental anxiety, emotional trauma, sleeplessness, lack of

diet, and other mental health issues that caused physiological damage to her body in the form of

a developing cyst near her spleen that had to be drained until the cyst was removed in June,

2022. The cyst was a result of the stress caused and aggravated by DHS in this matter.

61)    All the mental and physical complications experienced by Schoene are due to the actions

of Defendants, as alleged herein.

62)    Plaintiff Schoene is still in emotional therapy and/or on medications for the mental

injuries caused by DHS, as well as the ongoing hole in her heart from everything that happened

to Child, and that she has not seen him since December of 2020 (over 2.5 years ago).

## DEFENDANT DHS - GENERALLY

63)    The State of Oregon ("Oregon"), through DHS, protects children who cannot protect

themselves from abuse and maltreatment.

64)    DHS promotes on its website that persons who suspect child abuse should to report such

child abuse to the DHS statewide hotline.

65)    DHS advises the public, on its website, what are "warning signs" of child abuse:

   a)  Physical signs present on the child;
   b)  Behavioral signs or statements made by the child; or
   c)  Behavioral signs or statements made by the parent or caregiver.

66)    DHS advises the public to document what the person witnesses concerning the child

abuse, for information such as dates, times, places of injuries, severity, and the like.

67)    DHS encourages members of the public, such as Plaintiff, to report child abuse if a

person has *"reasonable suspicion"* of child abuse.

68)    DHS promulgated standards for reporting child abuse, investigations of child abuse, and

dispositions of child abuse, including safety protections for children as well as the person

reporting the child abuse to the DHS Hotline, or otherwise providing information to DHS in their investigation.

69)    Oregon has mandatory reporting laws, requiring many professionals to report child abuse to the DHS statewide hotline if child abuse is suspected, such as law enforcement officers, doctors, nurses, school employees, counselors, dentists, emergency workers, attorneys, CASA workers, and DHS employees.

70)    Any person who calls the DHS Hotline or provides information to DHS in an investigation, is afforded all civil rights under the US Constitution, whether the person is a mandatory reporter or a citizen who witnessed what they believed to be child abuse.

71)    Any citizen person against whom DHS makes a "founded disposition" under the authority given to DHS by Oregon statutory law, as provided through the Oregon Administrative Rules ("OAR"), and as reported to the federal government in CAPTA, has civil rights of due process under the Fifth and Fourteenth Amendments to the US Constitution.

72)    Any citizen person may exercise their freedom of speech rights under the First Amendment of the US Constitution, without interference from a governmental agency, and without any governmental agency attempting to prevent the free speech (as long as the free speech is not to incite imminent lawless action, to distribute obscene materials, burning draft cards, or school newspaper limitations).  Free speech includes submitting information to DHS and/or gathering and maintaining information and reporting such information from the evidence in the information that is based on truthful observations and/or facts and not to defame another.

73)    DHS was responsible for the delivery and administration of federal and state programs relating to the provision of child abuse prevention and treatment services.

74)    DHS has an ongoing duty to protect the legal interests of persons when conducting an investigation according to state law, properly notifying person(s) of an investigation and the

person's rights and responsibilities, and in making proper findings and conclusions about the alleged child abuse and person(s) being investigated.

75)     DHS has an ongoing duty to conduct investigations in accordance with state law, in order to be eligible for federal funds through the CAPTA program.

76)     DHS has been repeatedly sued in federal and state courts for its failures to protect children and provide for children's safety.  DHS has paid, and has been ordered to pay, significant sums to resolve many of these claims and lawsuits.

77)     DHS was audited by the Secretary of the U.S. Department of Health and Human Services ("DHHS") and by the Oregon Secretary of State ("SOS").  These audits showed many deficiencies, errors, and omissions by DHS in Oregon's child abuse prevention and treatment efforts, as required under CAPTA.

78)     The audits were critical of DHS' recruitment, retention, supervision, and training of employees, and noted DHS' inability to protect children's safety.  The SOS has been critical of DHS's organizational culture and lack of accountability.

79)     In response to the many lawsuits, audits, public outrage and negative media attention, DHS moved several managers and officers, and repeatedly promised to undertake corrective actions, but failed to correct in this instance.

80)     Also due to outside influences such as CAPTA compliance, in order to continue receiving federal funds, Oregon DHS in November 2020 published *"A Vision for a Transformed Child Welfare System."*[1]  Some of the areas where DHS is being "transformed" includes the following:

     a)  DHS transformation goal: *"Fewer re-reports and recurrences of maltreatment"* (Report page 7.)  This indicates DHS wants to "transform" the numbers it presents to federal DHHS (for CAPTA) with lower numbers of re-reports, thus potentially ignoring actual repeated child abuse by the same offender, in order to "transform" the

---

[1] See: https://www.oregon.gov/dhs/CHILDREN/CWTransformation/Pages/index.aspx;
DHS Transformation goals at: cw-apsr-2020-vision-for-transformation.pdf (oregon.gov)

numbers to appear as if less child abuse is occurring when that is not the case – as what occurred in this matter.

b) DHS transformation goal: *"High, clear expectations and accountability for all staff, managers, and leadership that ensure staff have direction, guidance, and support needed for the challenging work they to do every day."* (Report page 8.) This indicates there is a need for more accountability from DHS employees – as is the case here where DHS has attempted to bury its mistakes instead of being accountable for their many failures.

c) DHS transformation goal: *"Improved recruiting and hiring practices: DHS Child Welfare is working to revamp hiring and recruiting to help ensure that Child Welfare has the workforce, leadership, and succession planning it needs to support its mission, vision, and goals."* (Report page 9.) This indicates that DHS needed more caseworkers, as stated in the reports to have *"Reduced caseloads"* (*id.*).

## <u>FACTS OF UNDERLYING CASE</u>

81) Plaintiff unintentionally became involved in these proceedings involving the abuse of Child, and reported such abuse to the DHS statewide hotline. She never wanted to have or raise children.

82) Due to Plaintiff reporting the abuse, Defendants knowingly and intentionally took actions that severely damaged Plaintiff, as alleged herein.

83) Plaintiff had never been to Hood River before the incidents described herein.

84) The issues, facts and claims in this lawsuit involve custody, but is not about custody, it is about child abuse, the reporting of the suspected child abuse and subsequent abuses of power and how those abuses of power damaged Plaintiff, severely, as well as Child in this matter, and the father of Child, Mr. Michael Allen.

## PLAINTIFF MEETS CHILD; WITNESSES AND REPORTS INJURIES TO DHS

85)    Plaintiff had dated Michael Allen from 2014 to January, 2016. Mr. Allen grew up in

Hood River, Oregon. His racial identification and appearance is African-American.

86)    Unbeknownst to Plaintiff until November, 2017, Michael Allen was the father of a son

born in October, 2016, the child at issue in this lawsuit (the "Child").

87)    When Plaintiff saw Child, he had a black eye, and the next three (3) times she saw Child,

upon picking him up from the care of his mother, Greta Sanchez ("Sanchez" or "Mother") and/or

her relatives in Hood River, Plaintiff noticed further bruising and further black eyes. It was at

this time Plaintiff first called the DHS Hotline, in January 2019.

88)    Plaintiff suspected at this time that the injuries could have been from neglect by the

overseeing parent, Ms. Sanchez. Plaintiff further wanted to ensure any authority that the injury

was not caused by Mr. Allen Michael Allen or Plaintiff, as Ms. Sanchez had historically

attempted to get Mr. Allen in trouble.

89)    It was upon the filing of a Petition for Restraining Order by Ms. Sanchez against Mr.

Allen, on or about October 31, 2018, wherein Ms. Sanchez falsely accused Mr. Allen of

threatening her with physical harm (which is not the truth), that Plaintiff became "leery" of Greta

Sanchez. The court granted the petition, and DHS issued a "Protective Action Plan" ("PAP")

against Mr. Allen including a 10-day no contact order that ended on November 11, 2018.

90)    Plaintiff previously had not "judged" Sanchez as a "bad parent" or otherwise, but this

filing appeared to be malicious by Ms. Sanchez against Ms. Allen, from what Mr. Allen

described to Plaintiff.

91)    The same time Child had "suspicious" looking bruises that were significant in the number

of bruises/cuts, and in varying locations of his body. The bruises and his questionable

explanation(s) are what gave rise to Plaintiff "suspecting" possible child abuse (upon the "***suspicious physical injury***").

92)      Plaintiff began "looking into" what Mr. Allen was telling her – either to confirm if he was telling the truth, or otherwise, and found Ms. Sanchez to have a very troubling recent criminal record, and other issues with caring for a baby, and also that Sanchez had previously harmed her other child (her daughter in 2008 and 2014 wherein DHS was involved and opened the case DHS No. 343095, *In re: Greta Willis, nka Greta Sanchez*).

93)      Plaintiff later confirmed through official documentation, the events on October 16, 2017 wherein Ms. Sanchez was drunk at OHSU, transported in the ambulance with Child while heavily intoxicated, and assaulted Mr. Allen while Child was in the arms of Mr. Allen (the "OHSU Incident").  The police were called and Ms. Sanchez had further confirmation of being very drunk, with vodka in her bag.

94)      Only a few days later, on October 23, 2017, Sanchez was arrested in Hood River County for DUII, had a blood alcohol content of 0.31%, and had Child in the car, who was not yet one-year of age.

95)      This was Sanchez' third DUII between October 2013 and October 2017.

96)      On October 23, 2017, HRCCC Judge Karen Ostrye signed an Immediate Danger Order against Greta Sanchez, in HRCCC case no. 17DR22652, awarding full custody of the Child to Michael Allen.

97)      On October 31, 2017, DHS issued an Immediate Danger Order against Greta Sanchez in DHS No. 343095, *In re: Greta Willis, nka Greta Sanchez.*

98)      On or about November 2, 2017, Sanchez was arrested for theft from Walmart in Hood River, and was charged in HRCCC 17CR73112, *State of Oregon vs. Greta Renee Sanchez.*

99)    On or about November 6, 2017, Sanchez had a No Contact Order placed on her for the Walmart theft in Hood River, in HRCCC 17CR73112.

100)    On or about December 2, 2018, Plaintiff witnessed another black eye on Child, a different black eye from the black eyes she had witnessed on Child about 2 weeks earlier.

101)    On or about December 24, 2018, Plaintiff saw a third set of black eyes on Child, which were recent injuries.

102)    All of the injuries to Child observed by Plaintiff were while Child was in the care of the mother of Child, Greta Renee Sanchez.

103)    Sanchez confirmed the injuries happened in her care, giving excuses for each one.

104)    Because of the bruising to Child, Plaintiff researched and learned of the history of Greta Sanchez, which included numerous recent criminal convictions, including at least three (3) DUIIs convictions between 2013 and January 2018.

105)    Plaintiff carefully reviewed the records, learning also that Sanchez had mental/emotional issues, significant addiction problems, and ongoing family problems.

106)    Plaintiff requested Mr. Allen get medical and DHS documents as to Child, because she wanted to confirm what Mr. Allen had told her about Greta Sanchez was true or not.

107)    Mr. Allen advised Plaintiff that Sanchez may try to blame the black eyes and injuries to Child on Mr. Allen and Plaintiff, so Mr. Allen and Plaintiff called DHS following an injury they witnessed to the Child on December 24, 2018.

108)    DHS opened an inquiry into the report of this injury, and immediately closed the inquiry.

109)    At the time when Plaintiff first reported the injuries to Child to DHS, a DHS case had already been opened for Greta Sanchez as a perpetrator of child abuse, DHS No. 343095.

110)    DHS investigated the reports made by Plaintiff, and DHS took no action upon the first reporting by Plaintiff of suspected negligence by Sanchez.

111)    At this time, Plaintiff did not suspect child abuse, but negligence, on the part of Sanchez, in her care of Child.

112)    During the time when there was 50/50 shared custody, from April 2018 forward, all the serious injuries to Child that Plaintiff witnessed, only occurred while Child was in the care of Sanchez.

113)    What alarmed Plaintiff is that within one week of taking Child to the ER and assaulting Mr. Allen, that Ms. Sanchez received the DUII – both events endangering the safety of the baby (in October 2017 when Child was not even one-year old yet).

114)    Plaintiff, quickly studied about child abuse symptoms and signs, and then witnessed what she began to believe (and believes today) to be out-of-the-ordinary bruising on Child (*"**suspicious physical injury**"*), repeatedly, and Plaintiff, upon her concern for Child's safety and well-being, called the DHS Child Abuse Hotline, as any reasonable person would do given the repeated and patterned bruising upon picking Child up from the care of Ms. Sanchez.

115)    Plaintiff was looking out for the best interest of Child, and only Child.  She witnessed "suspicious physical injury" and reported it.  Her meeting Child, through her (then) relationship with Mr. Allen, was her first exposure in caring for a child, and she quickly educated herself about raising children in the physical "bumps and bruises" that children obtain through "normal" childhood and what is "abnormal" (and what is "suspicious injury" to be reported).

116)    Plaintiff consulted with therapists, friends who are mothers and one long-time daycare provider and mother – these people advised Plaintiff as to "normal" bruising and what is not normal.  Plaintiff showed photos of the bruising to her friends and her friends confirmed the bruising was abnormal, and suspicious.

117)    Plaintiff has spent countless hours, her own money (approximately $200,000, to date) and significant energy seeing to the best for Child.  Plaintiff is a "workaholic" and successful business woman for over 20 years.

118)    Plaintiff showed photos of the bruising to a parenting coach/therapist, who has known Plaintiff for 3 years, and who advised her: *"I recommended Kimberly document the bruises [Child] had.  As a former pediatric nurse I was worried about the constant bruises."*  (Nola Peacock at ROR-82-83.)  Plaintiff sought guidance from this therapist who advised her to report the injuries.

119)    Plaintiff had *"reasonable cause"* under OAR 413-015-0115(52) and OAR 413-015-0115(53) for *"reasonable suspicion"* of child abuse to Child.

120)    Plaintiff had *"good cause"* and *"reasonable cause"* upon *"reasonable suspicion"* to report to DHS all the physical evidence she perceived as child abuse upon Child (*"suspicious injury"* as the law intends) especially after the OHSU Incident and the 3rd DUII occurring in the same week in October, 2017.

121)    The DHS statewide hotline was created for reporting such child abuse as that was reported by Plaintiff to DHS, and Plaintiff should be commended, not condemned by DHS.  The very system set up to help children who have been abused instead punished the very person (Plaintiff) who helped "save" the well-being of Child.  That is the only thing that Plaintiff ever has cared about – the safety and well-being of Child.

122)    In the reporting of the concerns, and actions / in-actions taken by DHS, Plaintiff became more concerned with not only the safety and well-being of Child, but also other children in the *"DHS System,"* upon her discovery of facts in this matter as well as other *"DHS Horror Stories"* she heard first-hand from trusted friends and clients, as well as in the media.

123)    Plaintiff certainly had ***"reasonable cause to believe"*** that the baby and toddler Child had *"suffered abuse"* – as even found by DHS that Ms. Sanchez caused *"immediate danger"* to Child (and previously to her older daughter).

124)    Any good and reasonable person in the same position as Plaintiff should have the same protections and civil rights, and legal standing, due process and freedom of speech rights as do whistle blowers, mandatory reporters, and others who have received information, to document what the person witnessed, photograph, and to report the child abuse to the DHS Hotline, which Plaintiff did. In fact, DHS encourages people to report child abuse they witness, as do children's advocacy centers including the CGCAC on its website to *"REPORT CHILD ABUSE."*

## HOOD RIVER COUNTY OFFICIALS RETALIATE AGAINST & DEFAME PLAINTIFF UPON HER REPORTING OF INJURIES TO CHILD

125)    Throughout 2019 and 2020, Plaintiff witnessed Child having suffered from many injuries, including black eyes, parallel bruising on top and inside of the knees, multiple head injuries on the forehead, and bruising in the pattern of finger prints in his upper hip area.

126)    In February 2019, when Plaintiff received Child, he again had another black eye, and Plaintiff reported it to the DHS Hotline. Hood River DHS contacted the local jurisdiction, Multnomah County, and Multnomah County DHS caseworker Maleea Briggs came to the home of Michael Allen, in Portland, where Plaintiff and Child were also present.

127)    Ms. Briggs stated to Plaintiff and Mr. Allen that she was concerned with the injuries to Child, and advised Plaintiff and Mr. Allen about "Karly's Law."

128)    In April 2019, following even more black eyes Child sustained while in the care of Mother, Ms. Briggs was contacted and she advised both the father Michael Allen and Plaintiff, through a text, that they should reach out to Randall Children's Hospital/CARES NW pursuant to Karly's Law, as they specialize in child abuse.

129)    Plaintiff has good cause to believe DHS never looked into the injuries to Child that she reported, and dismissed every one without proper investigation, despite many calls from Plaintiff and others, and without regard to the evidence provided.

130)    Defendant Campbell, a Hood River County CPS Caseworker, was assigned to DHS No. 343095 regarding Greta Sanchez.

131)    Plaintiff has good cause to believe that Defendant Campbell summarily dismissed any claim made against Sanchez as to child abuse of Child.

132)    Plaintiff came to learn Sanchez had been the perpetrator of "founded" danger to her first child, Alexandra Willis, for more than one event wherein both DHS and Hood River County Circuit Court found the child Alexandra Willis and Child at issue here to be in "IMMEDIATE DANGER" due to the actions of Sanchez, their own biological mother.

133)    DHS entered Founded Orders of Neglect against Greta Sanchez in DHS No. 343095 in April 2014 and October 2017.

134)    Sanchez has at least five (5) Immediate Danger Orders entered against her either by Hood River County Circuit Court and/or DHS.

135)    Despite the Immediate Danger Orders, and Sanchez' criminal history, DHS continued to dismiss any claim of child abuse against Greta Sanchez, as made by Plaintiff or another, who called the DHS Hotline.

136)    Between the time period of December 22, 2019 until January 4, 2020, Child was transported back and forth between Plaintiff/Mr. Allen and Sanchez, and nearly each time Plaintiff/Allen would pick up Child, he had new bruising, including multiple marks on this face, multiple bruises on his body, grab marks, fingerprints, scratch marks, and the explanations given by Sanchez did not match the corresponding injuries.  The injuries were patterns of previous injuries.

137)    In early January, 2020, Child was picked up by Mr. Allen and Plaintiff and he had a large

hand grip mark on his upper arm.  This prompted Plaintiff to go to the Multnomah County DHS

office, Alberta Office in Portland, where she spoke with DHS Caseworker Melissa Cacho.

138)    Plaintiff showed Ms. Cacho photographs of the injuries to Child, and Ms. Cacho advised

Plaintiff that she was very concerned with the injuries to Child.

139)    Ms. Cacho advised Plaintiff she should seek an Immediate Danger Order through the

Court, and that Plaintiff should have their attorney file the documentation, as soon as possible.

140)    On or about January 13, 2020, based on the advice of Melissa Cacho of Multnomah

County DHS, due to the sequential injuries to Child while in the care of Sanchez in a 10-day

period, the attorney for Michael Allen, Lauren Barnhart, confirmed with Melissa Cacho of DHS,

and then filed for Immediate Danger against Sanchez in HRCCC case number 17DR22652.

141)    On or about January 14, 2020, a hearing was held before Judge Karen Ostrye on the

request for Immediate Danger.  The primary witness was DHS caseworker Stephanie Campbell.

142)    Campbell testified about Maleea Briggs' and Melissa Cacho's beliefs about the injuries,

stating that neither Ms. Briggs nor Ms. Cacho was concerned with the injuries to the Child.

143)    The testimony in the Custody Trial of both Maleea Briggs and Melissa Cacho of

Multnomah County DHS contradicted the testimony given by Stephanie Campbell as to whether

Multnomah County DHS was "concerned" about the injuries to the Child, when Multnomah

County reviewed the file.

144)    In the afternoon following the Immediate Danger hearing, on January 14, 2020 at

4:36pm, Melissa Cacho responded to a text message from Plaintiff, asking Plaintiff: *"Were you*

*granted temporary custody?"*

145)    After Plaintiff told her *"No"* that she was not granted temporary custody, Ms. Cacho

responded to Plaintiff's text by stating that she and her supervisor in Multnomah County were

concerned about the activities in Hood River County DHS as being *"suspicious"* and discussed

the *"possibility of an investigation being opened in Hood River."*

146)    Two of the text messages between Plaintiff and Ms. Cacho are as follows:

| Plaintiff: | *"They denied it. The DHS gal from Hood River said she spoke with DHS and you all agreed it did not look like abuse and no one was concerned... and we specifically asked if she [Campbell] spoke with you [Cacho] and she said yes."* |
|---|---|
| Cacho: | ***"That blows me away.*** *I know that's not true because my supervisor and I had a conference call with Stephanie [Campbell] and her supervisor expressing our concerns and that something is being missed. I actually spoke to our district consultant about your case last Friday, and she alluded to the possibility of an investigation being opened in Hood River. I'm going to discuss with her when I'm back tomorrow. Because they have apparently already closed their case, **which is suspicious**. From the time the last referral was made, that is not enough time to fully assess child safety in my opinion."* (Emphasis added.) |

147)    On or about January 16, 2020, Judge Ostrye dismissed the request for Immediate Danger as filed by counsel for the father Michael Allen.

148)    During 2019 and early 2020, Plaintiff showed the photographs of the injuries to clients or friends who are qualified professionals to get their expert opinion as to the injuries, and these professionals advised Plaintiff the injuries appeared to be concerning. These professionals also described what might have happened according to the patterns and series of bruising.

149)    The qualified professionals encouraged Plaintiff to report the injuries.

150)    The qualified professionals also advised Plaintiff to document everything, and take photographs of the injuries.

151)    Included in those who reviewed the photographs were either clients of Plaintiff, or Plaintiff's therapist, who are mandatory reporters of child abuse.

152)    Some of these mandatory reporters also met Child personally, during a hair appointment they had at Plaintiff's salon where Child was present.

153)  After personally witnessing injuries to Child themselves while at Plaintiff's salon where Child was present, some of these people inquired if Plaintiff had called to report the injuries to DHS.  Plaintiff advised there was under an ongoing DHS investigation, and was hesitant to call DHS herself, so some of the professionals themselves called DHS to report the child abuse they suspected occurred to Child, based on their own observations.

### DHS INQUIRY INTO CHILD ABUSE TURNS INTO INVESTIGATION AGAINST PLAINTIFF FOR "MENTAL INJURY"

154)  Hood River County officials retaliated against Plaintiff, and defamed Plaintiff upon her reporting of injuries to Child to the DHS Hotline.

155)  In mid-April, 2020, Michael Allen was told by Andy Perez of DHS District 9 that Plaintiff was "under investigation" for "over-reporting" of the injuries to Child (the "DHS Investigation Against Plaintiff").

156)  DHS did not directly advise Plaintiff herself that she (Plaintiff) was under investigation; DHS only told this to Mr. Allen.  DHS did not advise Plaintiff, nor Mr. Allen, of a person's legal rights or responsibilities, if that person is under investigation by DHS.

157)  DHS never directly advised Plaintiff in April 2020, nor any time thereafter, that she was under investigation by DHS; DHS further never told Plaintiff, nor Mr. Allen, that a person under investigation by DHS has certain legal rights and responsibilities.

158)  This was the same day Plaintiff saw Child with two black eyes, a fingerprint mark and/or bite mark or grab mark on his upper-inner thigh, and finger-like bruising on his hips, which Plaintiff took photographs of and emailed the photographs to Mr. Perez.

159)  Perez never once acknowledged the injuries, but instead would ask Plaintiff questions.

160)    Plaintiff has good cause to believe that because she was upset that DHS was not addressing the injuries, and ignoring her and the documentation she presented, DHS turned against her.

161)    Plaintiff later realized Perez was documenting information against Plaintiff in the DHS "investigation" against Plaintiff for mental injury, in his inquiries of Plaintiff.

162)    Plaintiff has good cause to believe that nearly all of her statements were misrepresented or misstated by Perez to fit what Perez wanted to put into the report, and Perez omitted information provided by Plaintiff that was relevant to suspicion of child abuse.

163)    After Plaintiff was learned from Mr. Allen that she was "under investigation" by DHS, instead of taking the Child to the doctor when she saw an injury to Child she suspected could be child abuse, Plaintiff took photographs of Child and sent the pictures to Andy Perez.

164)    Perez did nothing with any of the photographs sent by Plaintiff of injuries to Child.

165)    In its "investigation" of Plaintiff, DHS had little to no contact with Plaintiff.

166)    Plaintiff did speak briefly with Andy Perez and Saul Vences of DHS.

167)    In speaking with both Perez and Vences, Plaintiff expressed her frustrations and bewilderment with the actions of DHS that were concerning Plaintiff's reporting of the injuries, instead of looking into the actual injuries and making a reasonable assessment for themselves.

168)    Lydia Casas of Washington County DHS attempted to involve Plaintiff on a few occasions, but following her learning of a DHS investigation, Plaintiff was wary of speaking with any DHS representative and only spoke briefly with Ms. Casas, without too much detail.

169)    Ms. Casas visited Plaintiff's home where the Child told Ms. Casas, personally, that he gets *punched in the face* while in the care of Sanchez.

**CUSTODY TRIAL TESTIMONIES OF TWO INDEPENDENT MULTNOMAH COUNTY DHS CASEWORKERS INDICATE CHILD ABUSE & VINDICATE PLAINTIFF**

170)    Plaintiff reported the allegations of child abuse to Multnomah County, and two (2)

Multnomah County CPS Caseworkers, Maleea Briggs and Melissa Cacho, both of whom

testified in the Custody Trial that they were both *"very concerned"* about the injuries to the

Child, based on photographs they reviewed and other evidence.

**TESTIMONY OF MALEEA BRIGGS**

171)    Multnomah County CPS Caseworker Maleea Briggs, who worked as a DHS caseworker

for 3-1/2 years and worked at the time in the Portland Central Office of DHS, testified:

   a)  She agreed the injuries she was looking into were sustained while Child was under
       the care of Greta Sanchez;

   b)  She was made aware of further bruising *"for physical abuse"* caused by Mother
       and/or unknown perpetrator;

   c)  Child spent equal time with Mother and Father/Plaintiff;

   d)  She was *"concerned"* Child was *"being abused"* by Mother;

   e)  That parents sometimes try to manipulate the DHS/CPS system to gain a legal
       advantage, and that Father/Plaintiff did not attempt such here;

   f)  She was concerned about the *"amount and frequency"* of the injuries to Child;

   g)  Plaintiff Kimberly Schoene had a *"reasonable basis"* to report the injuries;

   h)  She would be *"concerned"* for a child's safety if the child sustained two (2) black
       eyes;

   i)  She would be *"very concerned"* if a child sustained 6-7 black eyes; and

   j)  The injuries to Child were primarily happening only in one parent's household, that
       of Sanchez.

172)    Ms. Briggs concluded that she believed Plaintiff did have reasonable cause to report the

injuries, and did not *"over-report"* to DHS.

173)    Ms. Briggs concluded that Sanchez should have been investigated further, and that this

matter was handled improperly by DHS/CPS in Hood River County.

174)    In the testimony of Maleea Briggs, she repeatedly stated she was *"very concerned"* about

the injuries to Child when he was in the care of Mother.

175)    In the testimony of Maleea Briggs, concerning any "over-reporting" by Plaintiff, Ms.

Briggs confirmed that it was reasonable for Plaintiff to report the injuries to DHS given:

    a)   The multiple injuries to the Child;

    b)   The types of injuries (many black eyes, bruising); and

    c)   Mother's explanation(s) given for the cause(s) of the injuries did not match the

       injuries.

### TESTIMONY MELISSA CACHO

176)    Melissa Cacho of Multnomah County CPS, Alberta Office, testified in the Custody Trial.

177)    Ms. Cacho's opinion was independent and separate from the independent conclusions of

Maleea Briggs, who works in a separate CPS office in Portland, the Central Office.

178)    The two "independent" CPS Caseworkers each agreed, on their own, that Plaintiff acted

reasonably, and they were both *"very concerned"* with the injuries to Child.

179)    Melissa Cacho's testimony confirms:

    (1) If a child had 3 or more black eyes she would be *"concerned"* and *"very concerned"*
       if the child had 5 or more black eyes;

    (2) She saw photographs of injuries and black eyes that made her concerned for Child;

    (3) She had concerns about multiple injuries to Child during the time he was in the care
       of Mother;

    (4) That she saw a <u>pattern</u> of injuries;

    (5) There were no inexplainable injuries while in care of the Father/Plaintiff;

(6) That Stephanie Campbell of Hood River CPS was <u>biased in favor of Mother</u>;

(7) Any concerned parent(s) would be reporting these types of injuries especially because of the number;

(8) That some people attempt to manipulate the CPS system to gain an advantage in custody disputes, but that did not occur with the Father/Plaintiff;

(9) That because of equal parenting time a child would sustain about the same number of injuries while in care of either parent; and

*(10)* As Ms. Cacho stated, the Child was: ***"not sustaining the same level of injuries that he's come back to their [Father/Plaintiff] house from the mothers."***

## SMALL TOWN BIAS AGAINST PLAINTIFF: PATTERNS OF MISCONDUCT BY DHS

180)    DHS works directly with CGCAC to perform child abuse assessments, forensic interviews, and administrative reviews.   CGCAC has performed many child abuse assessments over the years since it was founded in 2009 as the "only local child advocacy center" in the Columbia Gorge region.

181)    CGCAC was founded by Carrie Rasmussen in 2009.  Rasmussen was a Hood River County Deputy DA from 2005 until 2020 when she was elected as the District Attorney of Hood River County.

182)    CGCAC is a private business, third-party vendor, that provides services to DHS for many child abuse assessments, and CGCAC provides "expert testimony" in Court cases, mostly in Hood River County Circuit Court and Wasco County Circuit Court.

183)    There are longstanding relationships between DHS in Hood River and the Hood River County DA's Office, and CGCAC (and some of the same persons represent both the DA's Office and CGCAC in official proceedings, such as Carrie Rasmussen, Hood River County Deputy DA Leslie Wolf, Hood River County Victim's Advocate Gloria Needham, and others).  The DA's Office charges the person, sends the child to DHS, and DHS hires CGCAC to perform an

"independent" child assessment, forensic interview, or an administrative review for DHS for suspected child abuse.

184)    The Hood River County DA's Office and CGCAC are ran by the same person, Carrie Rasmussen.  DHS, at the center of this system, has a person who was in charge (Defendant Lawing) that was known to manipulate the legal system, and break laws, in order to achieve her agenda.  The same is true for the person who is the current DA and founder/director of CGCAC, Carrie Rasmussen.  These two knowingly and intentionally tainted the DHS Investigation Against Plaintiff, with CGCAC representative Robin Henson providing testimony against Plaintiff in the Custody Trial, making a false report against Plaintiff, all based on either false evidence or evidence that is not in the record.

185)    To prove the "bias" from independent and qualified persons, the two Multnomah County DHS Caseworkers, Maleea Briggs and Melissa Cacho, testified in the Custody Case they were *"very concerned"* about the physical abuse Plaintiff reported, and Plaintiff had a *"reasonable basis to report the injuries."*

186)    Both Multnomah County Caseworkers stated that Hood River County was ***"biased"*** in favor of Sanchez (and against Plaintiff).  Ms. Cacho stated in reference to Plaintiff: *"any concerned parents would be reporting injuries especially if they were occurring that frequently."*

187)    Both Multnomah County Caseworkers testified that Mr. Allen and Plaintiff were not reporting the injuries for custody purposes, and were justified in the reporting.

188)    Hood River/District 9 and Multnomah County apparently held a teleconference, and essentially nothing came of it.  Because Multnomah County DHS was dismissed from the proceedings at the time it happened is evidence of small-town bias, and appears to be the working of DHS District 9 Supervisor Linda Lawing.

189)     Because Judge Ostrye ignored the independent testimony of DHS Caseworkers who were

not "local" (Hood River or The Dalles) is evidence of the small-town bias and/or corruption in

Hood River County legal system and DHS system, as Judge Ostrye relied primarily on local

DHS caseworkers and CGCAC's Robin Henson, the longtime local doctor who likely had

testified before Judge Ostrye many times previously.

190)     Judge Ostrye was a public defender for many years in Hood River County before

becoming the judge there; Judge John A. Olson is the former long-time partner of the local

public defender firm and its founder Jack L. Morris.

191)     The local DHS caseworkers were heavily influenced by Defendant Lawing, the (then)

DHS District 9 Supervisor, controlling DHS actions in all of DHS District 9 including Hood

River County and Wasco County (which is in the nearby town of The Dalles).  Defendant

Lawing worked from The Dalles DHS Office.

192)     It was/is known to DHS District 9 and DHS Statewide, as to the misconduct by DHS

District 9 Program Director Linda Lawing, who authored a report against Plaintiff.

193)     In a federal case *A.G., et al v. Tanya Burroughs, et al* filed June 21, 2013, 3:13-cv-01051-

AC, the Plaintiffs were fifty-eight (58) disabled children who were sexually abused while in the

Oregon DHS/CPS System.  Linda Lawing was a named defendant in the *A.G.* lawsuit.

194)     In a Complaint filed in Wasco County Circuit Court on March 24, 2016, *Shandie Johnson*

*and Tammarra Ferguson v. State of Oregon, by and through its Department of Human Services*,

16CV09451, the whistleblower Plaintiffs were both employees of DHS District 9 in The Dalles.

195)     Both Shandie Johnson and Tammarra Ferguson worked as a "Social Service Specialist 1"

in District 9, providing services to the five (5) counties in district 9: Wasco, Hood River,

Sherman, Gilliam and Wheeler.  They worked in The Dalles, in the same office as Linda Lawing,

located at 700 Union St., Suite 230, The Dalles, OR 97058.  This is the only DHS office in The

Dalles. This is the same office/address that sent the May 10, 2021 DHS Decision and July 22, 2021 DHS Decision and under their leadership the DHS Investigation Against Plaintiff was undertaken.

196)    These two long-time DHS employees, Johnson and Ferguson, with 11 and 6 years of working for DHS, respectively, made disclosures and multiple reports of violations of state law, rules, regulations, or mismanagement, waste of funds or abuse of authority by DHS District 9.

197)    The reports included *"systematic and ongoing violations of the use of protective action plans when such a plan failed to protect a child from conditions which reasonably appeared to jeopardize the child's welfare."*

198)    Following the written reports in May, 2014, the Plaintiffs Johnson and Ferguson were told by Defendant Lawing (and/or Tyler Flaumitch, the supervisors), the following in response to the reports' allegations of misconduct by District 9:

    a)    *"Management is policy"* (instead of written DHS rules, guidelines and policy)

    b)    *"The __train is leaving the station__ and __if you are not on board__ you will find yourself walking the pavement __looking for a new job__"*

    c)    *"It is not your job to worry about following the law"* and to leave *"legal interpretations and arguments to the attorneys"*

199)    The jury found in favor of Plaintiffs Johnson and Ferguson and awarded the full amount prayed for in the Complaint (see Complaint ¶ 27 and Case Information Sheet for judgment amount of $1,543,306.75, signed by Judge John A. Olson on Nov. 27, 2019).

200)    Defendant Lawing is a DHS District 9 *"ringleader"* who orchestrates these events, as she had previously instructed Shandie Johnson and Tammarra Ferguson to *"get on the train"* but because they did not comply, and reported Lawing, these two whistleblowers were fired by Lawing; however, the jury in Wasco County awarded them "full damages" for their exposing the

corruption withing DHS District 9, and that of Supervisor Defendant Lawing. The same applies here, corrupt practices and not following the laws and rules.

201)    DHS District 9 supervisors, including Defendant Lawing, continuously broke the laws and rules, and went further to first try to "silence" the whistleblower Plaintiffs, and to "protect thine own," District 9 supervisors <u>fired those who exposed the misdeeds of Linda Lawing</u>.

202)    Plaintiff has good cause to believe that Defendant Lawing's involvement in this matter, against Plaintiff, was to ***"get rid of the problem"*** instead of trying to correct the problems and reported child abuse of Child.

203)    DHS District 9/The Dalles/Hood River all sought (and did) ***"sweep it under the rug"*** trying to avoid further disrepute, by discounting and ultimately dismissing the valid reporting of Plaintiff of the physical abuse to Child.

204)    In fact, one of the issues in the *Shandie Johnson* lawsuit was concerning the mis-use of a Protective Action Plan ("PAP") by DHS District 9 and Defendant Lawing as supervisor. In the present case, Plaintiff became involved shortly after a PAP was put on Michael Allen, based on false information provided by Greta Sanchez, to DHS. Defendant Campbell issued the PAP to Mr. Allen in November 2018 that was without merit and based on hearsay from Sanchez.

205)    The mis-use of a PAP was at issue in the same time period as the trial in in the *Shandie Johnson* lawsuit, as well as in the underlying action in this case (in late 2018), and one of the reasons Plaintiff began obtaining documentation when she first began looking into what Mr. Allen had told her about Hood River County.

206)    The Federal DHHS Report showed many problems with the Oregon DHS system, as experienced in this case.

207)    In a significant DHS Report in DHS No. 343095 (Greta Sanchez), the author was Defendant Lawing, Supervisor. Supervisor Defendant Lawing put herself in charge to ensure

that DHS would protect its own deeds/misdeeds, to cover up the improper actions of DHS, and lay the framework to *"get rid of any problem"* so that their *"train"* would operate under *"management's policy"* of Linda Lawing and not according to state laws and rules, as the jury found in the *Shandie Johnson v. DHS* lawsuit and awarded full damages.

208)    Following the Lawing Report, DHS contacted CGCAC and/or its founder and leader Carrie Rasmussen (or through CGCAC Executive Director Beatriz Lynch ~~most likely one of the two~~) to have CGCAC conduct an "expert evaluation" of Child, and to make findings against Plaintiff.

209)    Plaintiff believes that DHS and Defendant Lawing poisoned the waters against Plaintiff (and Mr. Allen) when communicating to CGCAC to conduct the "expert evaluation" – that was used in the Custody Trial through the testimony given by Robin Henson in the Custody Trial.

210)    The first DHS Caseworker involved in this matter, who testified at the January 14, 2020 hearing and in the Custody Trial in July 2020, was Defendant Campbell.

211)    Defendant Campbell of DHS has the following conflicts which are apparent in this case:

    a)    Defendant Campbell, is shown on the CGCAC marketing video.  Campbell stated in the video: *"I work with law enforcement **as well as Safespace**, and I **refer for an interview to be conducted**."*

    b)    Defendant Campbell is on the "Endorsements" for Carrie Rasmussen for DA Campaign in 2020.  She is listed in the Voter's Pamphlet.

212)    Plaintiff has good cause to believe that Defendant Lawing contacted Carrie Rasmussen as leader of CGCAC to have Robin Henson conduct the assessment for CGCAC.

213)    Plaintiff has good cause to believe that these three women were all ~~out~~ against Plaintiff, as alleged in the CGCAC Complaint filed March 22, 2022 by Plaintiff (Multnomah County Circuit Court case number 22CV09782).

214)    Evidence shown from the Lawing Report and Defendant Lawing being in charge of DHS

District 9, the number of assessments performed by CGCAC, the limited staff, that it is highly

likely Linda Lawing and Robin Henson know each other, and are connected with Carrie

Rasmussen who has worked in the HRC DA's Office since 2005, and founded CGCAC in 2009.

215)    The evidence suggests that Defendant Lawing, Carrie Rasmussen and Robin Henson all

know each other, and all have worked on cases throughout the last 15+ years as Defendant

Lawing for DHS, Rasmussen for the DA's Office, and Henson for CGCAC.

216)    The Hood River/The Dalles are connected and conflicted, in favor of the local person

who was accused of the child abuse (Sanchez) and against the person who is not local, Plaintiff

(Kimberly M. Schoene), as is shown in the history of this case.  This local DHS-DA-CGCAC

connection were all against Plaintiff.

### DHS DECISIONS AGAINST PLAINTIFF BASED ON FLAWED INVESTIGATION; APPEAL BY PLAINTIFF & REVERSAL OF DECISION BY DHS

217)    DHS took negative actions against Plaintiff as described herein, including DHS agents

Defendant Andy Perez and Defendant Saul Vences.

218)    Plaintiff challenged both Defendant Perez and Defendant Vences as to their actions

against Plaintiff and for their failure to investigate the child abuse, but instead were investigating

her.

219)    Due to the actions of DHS, Plaintiff became very upset with DHS, and verbally

admonished both Defendant Perez and Defendant Vences, largely due to the frustration DHS

caused to Plaintiff by not taking any real action as to the child abuse.

220)    Plaintiff has good cause to believe that District 9 DHS Caseworkers, including Defendant

Perez, Defendant Vences, and Defendant Campbell, did not like that Plaintiff challenged them

and questioned their motives.

221)    On or about May 10, 2021, DHS issued a "Founded Disposition" against Plaintiff, stating

Plaintiff had caused *"Mental Injury"* to Child (the "05/10/21 DHS Decision" or the "1st DHS

Decision"). This was signed by Defendant Tobar.

222)    The 1st DHS Decision states, in relevant part:

> "At the end of our investigation we determined there is reasonable cause to believe abuse or neglect occurred. Our office defines 'a reasonable cause to believe abuse or neglect occurred' as 'founded.'
>
> "It is based on the following that we believe you are responsible for:
>
> "• **Mental Injury** of [Child] by his father's significant other, Kimberly Schoene, as a result of Kimberly's obsessive behaviors, constant questioning and reporting of [Child]'s alleged abuse to the Oregon Child Abuse Hotline and medical professionals for allegations which had been determined to be unfounded placed [Child] at risk for emotional harm. The behaviors continued despite having a judge tell her to stop reporting false allegations."

223)    The May 10, 2021 DHS Decision had minimal facts to support the conclusion, and of the

facts given, at least one of them is false – a judge never advised Plaintiff to stop reporting.

224)    The May 10, 2021 Founded Disposition is based on an *"Assessment Completed*

*03/18/21"* which is the October 27, 2020 Assessment by Defendant Vences. {Plaintiff requested

the assessment from DHS in June 2021, but it was not provided by DHS to Plaintiff. ~~until~~

Plaintiff petitioned the Oregon Attorney General's Office in November, 2021 for DHS records,

which was undertaken by Senior Assistant Attorney General Frederick Boss, who advised that

DHS  in a letter to Plaintiff dated November 22, 2021.

225)    In the DHS Decisions, DHS cites to *"the documentation, including..."* they relied upon in

making the Founded Disposition against Plaintiff.

226)    Plaintiff has good cause to believe that the *"the documentation, including..."* includes

additional records that Plaintiff should have access to, and requested, but DHS denied her valid

requests and by doing so, denied Plaintiff's due process rights.

227)    Plaintiff received the May 10, 2021 DHS Decision on May 19, 2021.

228)    On June 18, 2021, Plaintiff filed an appeal, titled "Request for Review of Child

Protective Services Founded Disposition Dated May 10, 2021" (the "Request for Review").

229)    On July 22, 2021, DHS Local Child Welfare Office Committee issued a decision stating

there was reasonable cause that Plaintiff was responsible for Mental Injury to Child (the

"07/22/21 DHS Decision" or "2nd DHS Decision").  This was signed by Defendant Hughes.

230)    The 2nd DHS Decision states in relevant part:

> "A review was held and it was decided that there is reasonable cause to believe that you are responsible for the Mental Injury of [Child].
>
> "This decision was based on the following: There are **multiple medical records** documenting that your continued efforts to have [Child] interviewed and seen medically regarding your suspected abuse of child has cased emotional distress and various trauma responses from the child.  You were informed of the harm to child and continued to have him interviewed and seen repeatedly by medical professionals thus causing mental injury and a severe negative impact to the child's mental and emotional wellbeing." (Emphasis added.)

231)    The July 22, 2021 DHS Decision cites to *"the assessment completed: 3/18/2021."*

232)    On or about August 9, 2021, Plaintiff received the July 22, 2021 DHS Decision.

233)    On or about September 8, 2021, Plaintiff filed a timely appeal, by hand-delivering her

appeal document titled *"Request for Central Office CPS Founded Disposition Review (OAR 413-

010-0740)"* to Jamie Radcliffe, Department of Human Services, Child Welfare, 700 Union

Street, Suite 230, The Dalles, OR 97058.

234)    DHS Central Office was supposed to issue a *"Notice of Central Office CPS Founded

Disposition Review Decision" ("Central Office Decision")* within 60 days of receipt of the

Request for Central Office Review, or by November 8, 2021, pursuant to OAR 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.

235)    Plaintiff advised Ms. Radcliffe, repeatedly, over the phone, that a decision from DHS

Central Office was due by November 8, 2021.

236)    On or about November 20, 2021, Plaintiff had still not received a DHS Central Office

decision, and after inquiring and being told nothing by DHS, Plaintiff filed a Petition for Writ of

Mandamus in the Oregon Supreme Court, seeking a writ for DHS to issue a Final Order.

237)    The Supreme Court opened a case on December 9, 2021 in *State ex rel Kimberly Schoene*

*v. Fariborz Pakseresht*, Supreme Court No. S069066, and ordered *"The Memorandum in*

*Opposition is due on December 22, 2021."* DHS never filed anything in response to the

mandamus petition filed by Plaintiff.

238)    On December 10, 2021, Plaintiff sent a letter to *"DHS and Miranda Larson"* giving a

brief history of events after Plaintiff filed the Request for Central Office Review in The Dalles,

including the mandamus petition, and stated the following:

> *"However, the petition [for mandamus] is pending, and I have yet to hear anything from DHS.*
> *Regardless of the petition for writ of mandamus, please advise as to the current status of the*
> *DHS issuing a final order in this matter – a date that I can expect a Final Order to be*
> *issued.... please give me firm and final dates that DHS will be issuing a Final Order."*
> *(Emphasis added)*

239)    DHS never responded to Plaintiff's December 10, 2021 letter.

240)    After filing the first appeal with DHS in June, 2021, during the months of July - October,

2021, Plaintiff began to question why or how could Hood River become so biased against her

and in favor of Sanchez, other than that Sanchez grew up in Hood River. Plaintiff diligently

researched and found numerous serious issues within the Hood River County legal systems,

therapy systems (state sponsored), the public defenders and funding, district attorney's office.

241)    During the months of July – October, 2021, Plaintiff discovered what she believed then

and believes today to be judicial misconduct, attorney misconduct, malicious prosecution by the

District Attorney, and financial fraud on the part of the public defenders, in Hood River County.

242)    During the months of July – October, 2021, Plaintiff filed several affidavits in Multnomah County Circuit Court ("MCCC") 140443883, with evidentiary exhibits, showing the problems in the Hood River County *"legal consortia"* and *"therapy consortia"* as Plaintiff termed those systems.

243)    Plaintiff has good cause to believe, and through the filings has shown, an attempt to cover up information in Hood River County, to erase public records illegally, and other illegal acts in the corrupt systems.

244)    Plaintiff has good cause to believe that Hood River County officials, including some of these Defendants, used their positions of power and authority to knowingly and intentionally defame Plaintiff, in the DHS Investigation Against Plaintiff, and in related legal proceedings.

245)    On or about January 22, 2022, Plaintiff received the January 19, 2022 DHS Decision where DHS states: *"A review was held and it was decided that there is <u>not reasonable cause to believe</u> that you [Plaintiff] <u>are responsible for the Mental Injury</u> of [Child]."* (the "01/19/22 DHS Decision" or the "3ʳᵈ DHS Decision").  This was signed by Defendant Dale.

246)    The 3ʳᵈ DHS Decision, made by the DHS Central Office, stated as follows:

> "A review was held and **it was decided that there is not reasonable cause to believe that you are responsible for the Mental Injury** of [Child]. It was decided that there is reasonable cause to believe that you are responsible for the Threat of Harm of [Child].
>
> "This decision was based on the following: **The documentation, including medical and mental health records, law enforcement reports, case history, and witness statements** supports that your questioning of [Child] put him at risk of being significantly harmed by you." (Emphasis added.)

247)    This ruling by DHS Office of Child Welfare Programs, the "Central Office Review" is a reversal of the May 10, 2021 DHS Decision and the July 22, 2021 DHS Decision from the local offices in Hood River and The Dalles, both of which Plaintiff appealed.

248)    The 01/19/22 DHS Decision reversed the "founded disposition" finding of ***"Mental Injury"*** against Plaintiff, only as a result of Plaintiff's appeals.

249)    The 01/19/22 DHS Decision made a new finding of *"Threat of Harm"* against Plaintiff. Plaintiff appealed that to the Central Office, and a DHS Final Order was issued on May 10, 2022, concurring in the finding of *"Threat of Harm"* (the "Final Order" or "4th DHS Decision").  This document was signed by Defendant Schriner.

250)    Plaintiff appealed the 05/10/22 DHS Final Order by filing a Petition for Judicial Review to Washington County Circuit Court on May 20, 2022, case no. 22CV16664 (the "DHS Case").

251)    If Plaintiff did not file the two (2) appeals, on June 18, 2021 and September 8, 2021, then the first two (2) DHS Founded Dispositions against Plaintiff, finding she caused *"Mental Injury"* to Child, would have been held against her for her entire lifetime, and all the resulting pain and suffering, and stigmas attached to someone who had been found by Oregon DHS to have "mentally abused" a young child.

252)    It is only upon the appeal of Plaintiff that DHS reversed its decisions it made in the 1st DHS Decision and 2nd DHS Decision of "Mental Injury" against Plaintiff.

253)    The incorrect finding by the DHS Hood River and DHS District 9 (The Dalles) of "Mental Injury" against Plaintiff caused great harm and injury to Plaintiff, including the Stalking Action and allegations made in that case, the December 21, 2021 hearing in the Stalking Action where Defendant Vences testified against Plaintiff, as well as severe damage to Plaintiff's emotional well-being, physical well-being and business interests from May 19, 2021 until today.

254)    Mental Injury is no longer a founded disposition against Plaintiff.  The DHS Central Office stated there is ***"not reasonable cause"*** to believe such Mental Injury existed in the January 19, 2022 DHS Decision.

255)     DHS local offices in Hood River and The Dalles knowingly and intentionally caused

harm to Plaintiff through their continued and repeated defamation against Plaintiff, knowingly

making false allegations against Plaintiff and without giving any written findings of fact.

256)     DHS further violated Plaintiff's due process by not allowing Plaintiff to review the

documentation being used against her, including the *"Assessment Completed 03/18/21"* and

other documentation used in the DHS Investigation Against Plaintiff, which resulted in the DHS

decisions against Plaintiff.

257)     Plaintiff read the definition of *"Mental Injury"* upon receipt of the DHS May 10, 2021

Founded Disposition, and it caused her great alarm, mental anguish, and emotional pain.

258)     **"Mental Injury"** is defined in OAR 413-015-1015(1)(c) as follows: *"Mental injury*

*(psychological maltreatment), including **cruel or unconscionable acts** or statements made,*

*threatened to be made, or permitted to be made by the parent or caregiver that has a direct effect*

*on the child. The parent or caregiver's behavior, intentional or unintentional, must be related to*

*the observable and substantial impairment of the child's psychological, cognitive, emotional or*

*social well-being and functioning."* (Emphasis added.)

259)     The language of **"Mental Injury"** highly defamatory when a governmental agency, DHS,

makes that finding against a person, and is highly damaging to the person to whom the

accusation is being made.

260)     The finding against Plaintiff of *"Mental Injury"* was outrageous conduct by DHS, based

on the actions of Defendants as alleged herein.

261)     DHS acted with acted with malice towards Plaintiff in finding her as having committed

*"Mental Injury,"* Defendants have shown a reckless and outrageous indifference to a highly

unreasonable risk of harm to Plaintiff, and Defendants acted with a conscious indifference to the

health, safety and welfare of Plaintiff and others including Michael Allen and Child.

262)    The time it took DHS from making the 1st DHS Decision on May 10, 2021, until the

Final Order was issued on May 10, 2022 (exact same date, one year later), was delayed by DHS,

and they did not comply with the statutory time limit requirements for issuing a decision on

Plaintiff's first appeal, nor in issuing the final decision.

263)    Plaintiff has not seen Child since Christmas 2020, and the 1st DHS Decision made it

"official" that Plaintiff could not see Child from May, 2021 until today, given the Washington

County Case is pending.

264)    It has been over two (2) years from the 1st DHS Decision that the actions and decisions

by DHS have prevented Plaintiff from seeing Child, which causes Plaintiff pain and suffering

each day she cannot see Child, and during the same time she has spent countless hours in the

appeals of the each of the DHS decisions.

### DHS DID NOT ADVISE PLAINTIFF OF INVESTIGATION OR LEGAL RIGHTS

265)    Plaintiff was not advised by DHS, or any representative or DHS, of an investigation by

DHS, against Plaintiff, when DHS began its investigation concerning Plaintiff in April, 2020.

266)    Plaintiff was not directly advised by DHS, or any representative or DHS, of an

investigation by DHS, against Plaintiff, during the time DHS when was conducting its

investigation concerning Plaintiff, from April 2020 to April or May, 2021.

267)    On or about October 30, 2020, following the Custody Trial, Plaintiff was advised by

DHS Washington County caseworker Lydia Casas that DHS had opened an investigation into the

actions of Michael Allen.

268)    Ms. Casas did not specifically advise Plaintiff that she, Plaintiff, was under investigation

by DHS.  Plaintiff was told by Casas that Mr. Allen was under investigation for neglect, because

he allowed Plaintiff to *"over-report"* or *"over-document"* her concerns about child abuse to

Child.

269)    No DHS representative, not Defendant Perez, not Defendant Vences, not Lydia Casas, nor any other DHS representative, ever advised Plaintiff that DHS was investigating her, and nobody ever used the words: *"mental injury"* or *"threat of harm"* in context of Plaintiff being investigated for those charges.

270)    Plaintiff had never heard "mental injury" or "threat of harm" as items DHS was or may investigating concerning Michael Allen, or herself.

271)    Plaintiff was never advised of any legal rights or responsibilities she had, by DHS or a representative of DHS, at any time during the DHS Investigation Against Plaintiff, as required under Oregon law, and/or the "State Plan," and/or federal law and CAPTA requirements.

272)    Plaintiff's first confirmation, from DHS, of the DHS Investigation Against Plaintiff, and that an assessment was conducted was on May 19, 2021, when she received the 1st DHS Decision dated May 10, 2021.

273)    The May 10, 2021 DHS Decision provided Plaintiff's legal rights and responsibilities, under law, of how to appeal the May 10, 2021 DHS Decision.

274)    The May 10, 2021 DHS Decision is the first time DHS provided Plaintiff with any of her legal rights and responsibilities.

275)    Plaintiff had never heard the term *"Mental Injury"* until she received the May 10, 2021 DHS Decision on May 19, 2021.

276)    Immediately upon receipt of the May 10, 2021 DHS Decision, Plaintiff looked up the definition of the term *"Mental Injury"* in the Oregon Administrative Rules that DHS had found this against her, and read the official definition for which she had been charged by DHS, defining her actions as *"cruel or unconscionable acts"* to Child.

277)    When Plaintiff read the definition of *"Mental Injury"* in the OAR, she was shocked to the core of her being, deeply saddened, and knowing the finding by DHS was outrageous and incorrect, and made upon a biased DHS system in Hood River.

278)    Plaintiff became determined to challenge the finding, which she did, and continues to fight to this day over two (2) years later and still no resolution.

279)    Following the May 10, 2021 DHS Decision, Plaintiff requested records from DHS that were used in the investigation, and the *"assessment completed 03/18/21"* but DHS refused to send any documentation to Plaintiff, without any reason.  Despite having even one document produced by DHS, Plaintiff got *"Mental Injury"* overturned by the DHS Central Office.

## HOOD RIVER POLICE REPORT & DHS DEFENDANT VENCES

280)    In fall 2021, Plaintiff received a police report written by City of Hood River Police Department ("HRPD") Detective Anthony Frasier dated December 22, 2020 (the "HRPD Report").  The HRPD Report was produced by Hood River County District Attorney Carrie Rasmussen to Plaintiff's attorney in the Stalking Action.

281)    The HRPD Report was based on a report made to HRPD by Jennifer Hinman, the attorney for Greta Sanchez in the Custody Case.

282)    Hinman was a member of the 7th District Consortium, an organization formed by Jack L. Morris to organize local public defenders in Judicial District 7 (for 5 counties).

283)    Morris' own law firm, Morris & Sullivan PC, represented Greta Sanchez in numerous criminal matters in Hood River County between 2013 to 2017, including two (2) DUII convictions in Hood River County presided by Judge John A. Olson.

284)    Judge John A. Olson was a longtime partner of Jack L. Morris in the firms of  "Morris & Olson, P.C." and Morris Olson Starns Sullivan (or "MOSS"), or under other similar names, in Hood River and The Dalles, from approximately 2000 to 2011.

285)   Morris Sullivan got records expunged for Greta Sanchez in 2019, signed by Judge John

A. Olson, and was attempting to do so again in 2021 in four (4) criminal cases, until Plaintiff

filed an objection on July 26, 2021 that halted the attempted expungements.

286)   The 2021 expungement attempts were not in accordance with Oregon law, and Plaintiff

has good cause to believe the 2019 expungement of Greta Sanchez' criminal records also were

not in accordance with Oregon law.

287)   After Plaintiff filed a complaint with the Oregon State Bar in September, 2021, Morris

Sullivan filed four (4) motions to strike, in four (4) cases, for the Courts in Hood River County

and Multnomah County to strike the four (4) affidavits it filed in the four (4) cases that were

seeking to expunge the criminal records of Greta Sanchez, because each of the four (4)

separately filed affidavits *"contains factually incorrect information."*

288)   Through the filing of the four (4) motions to strike, Morris Sullivan admitted it lied to

two (2) Circuit Courts, in the affidavits it filed in four (4) separate criminal cases for Greta

Sanchez.

289)   Based on the advice from her attorney at Morris Sullivan, Mr. Joshua Gums, Greta

Sanchez knowingly and intentionally signed the four (4) affidavits, knowing that each of four (4)

affidavits contained false information, i.e., that she had "no other criminal convictions in the

previous 10-year period" that was required under the "expungement statute" in operation at the

time, ORS 137.225.

290)   Detective Frasier states in the HRPD Report that he was contacted by DHS caseworker

Saul Vences, and Vences sent him a communication that is quoted in the HRPD Report.

291)   Defendant Vences' communication to Frasier is about open DHS investigations of child

abuse to Child, and an investigation written as follows *"10/29/2020 Mental Injury to [Child] by*

*Kimberly Schoene and Neglect to [Child] by Michael Allen."*

292)    Defendant Vences never advised Plaintiff that she was under investigation for *"Mental Injury."*

293)    The communication sent from Defendant Vences to Detective Frasier stated the following about conversations with Plaintiff:

  a)    *"I have not yet been able to have a productive conversation with [Plaintiff]."*

  b)    *"I have not yet had the opportunity to meet [Plaintiff] in person or have a productive phone call with her.  [Plaintiff] has stated she will have her attorney contact us as she does not trust Hood River ODHS."*

294)    The information Defendant Vences gave to Detective Frasier is based on hearsay that Vences received from Sanchez, against Plaintiff.  Defendant Vences relayed the unsubstantiated and false information from Sanchez to HRPD Detective Frasier who put it in his report as if true facts backed by evidence.

295)    The HRPD Report states that on December 17, 2020, Detective Frasier met Defendant Vences and Brenda Borders at CGCAC, for Borders to conduct a forensic interview of Child.

296)    Borders is employed by Wasco County Sheriff's Office, and acting here as the representative for CGCAC to conduct the forensic interview during the time of the DHS Investigation Against Plaintiff, and during the HRPD investigation into Plaintiff – which resulted in the Stalking Action against Plaintiff, which was ultimately dismissed due to lack any evidence against Plaintiff.

297)    As part of her appeal process of the DHS decisions, and in the CGCAC Case, Plaintiff properly requested DHS communications and records sent to/from CGCAC, but was denied each and every records request she made from DHS and the attorney for CGCAC.

298)    In the CGCAC litigation the attorney objected to production of any records between DHS and CGCAC.

299)    In the DHS Case discovery, DHS did not produce any assessment from CGCAC although requested in discovery in the DHS Case. DHS did not produce anything from CGCAC until the 2nd or the 3rd DHS Production in February and March of 2023, and only after Plaintiff had to repeatedly request such records in the litigation.

300)    Plaintiff has good cause to believe there are substantial communications and records to/from DHS and CGCAC relevant to those cases and discoverable, but both DHS (in the DHS Case) and CGCAC (in the CGCAC Case) have refused to produce any assessment and many other relevant and discoverable documents pertaining to Plaintiff.

301)    Plaintiff has good cause to believe DHS and CGCAC have knowingly and intentionally not produced communications and records to Plaintiff, in order to hide information from Plaintiff, to prevent further evidence of Plaintiff's allegations in both the DHS Case and the CGCAC Case, and this case.

302)    The actions by the attorneys in the Three Related Cases has been detrimental to Plaintiff's legal cause, delaying all three cases, causing unnecessary time and expense to Plaintiff, and is causing Plaintiff further emotional pain and suffering by the constant "brick wall" she has been faced with in trying to get relevant and discoverable documentation.

303)    Plaintiff has good cause to believe that the abuse to Child was being ignored (when she reported it), and now documentation is being buried. Plaintiff has continuously sought records that should be available to her in order to defend herself.

304)    Because of what Plaintiff believes to be ignoring the child abuse and hiding of records, it is deeply concerning to her and another source of frustration, stress, pain and suffering, along with the legal time and expenses of seeking these records that should have been made available to her long ago, and still have not been produced, despite all her efforts. This lawsuit seeks to obtain those relevant records, as well as the damages caused by Defendants in denying Plaintiff's

rights to records relevant in discovery in the DHS Case, in the CGCAC Case, and in the underlying cause of the appeal of the DHS decisions.

### DA CARRIE RASMUSSEN RETALIATES AGAINST PLAINTIFF – FILES STALKING ACTION ON BEHALF OF MOTHER & DHS

305)    On July 26, 2021, Plaintiff filed an Objection to Motion to Set Aside filed by the attorney for Greta Sanchez, Joshua Gums of Morris Sullivan PC, in four (4) cases, including two (2) cases in Hood River County, 130285CT and 17CR70608, and two (2) cases in Multnomah County, 140443883 and 19CR62977.

306)    On or about August 8, 2021, Plaintiff received documentation from the Hood River County District Attorney's Office titled *"District Attorney's Information"* in HRCCC 21CR37600 (the "Stalking Action").

307)    Plaintiff has good cause to believe that her filing of the Objection on July 26, 2021, and subsequent filing of her Response to DA's Belated Objection on July 29, 2021, prompted Hood River County District Attorney Carrie Rasmussen into filing the Stalking Action against Plaintiff, on behalf of Greta Sanchez and DHS.

308)    The Stalking Action is based on a police report by Hood River Police Detective Anthony Frasier dated December 22, 2020, the DHS Investigation Against Plaintiff.

309)    Upon receipt of this information, Plaintiff felt heavy stress and was alarmed that she was being charged with a criminal action.

310)    Plaintiff believes Carrie Rasmussen was knowingly and intentionally trying to intimidate and harass Plaintiff unnecessarily and beyond the scope of a criminal Stalking Action, in order to prevent Plaintiff from pursuing legal recourse against those who caused her harm, including but not limited to Defendant DHS, the individual defendants named herein, CGCAC, City of Hood River Police Department, and the Hood River County District Attorney's Office.

311) Plaintiff was severely harmed by having to be "arrested" and handcuffed for the first time in her life, and was traumatized by the event and resulting loss of sleep, high anxiety, PTSD, and other emotional and psychological trauma.

312) On or about December 21, 2021, in the Stalking Action hearing on the motion to dismiss based on venue filed by Plaintiff's attorney, DA Carrie Rasmussen brought witnesses to testify against Plaintiff, as follows:

    a) Beatriz Lynch on behalf of CGCAC and Safespace. Lynch read a letter she wrote, in full, about some of the events in this case which letter defamed Plaintiff.

    b) Defendant Saul Vences of DHS told numerous lies, defaming Plaintiff.

    c) Greta Sanchez, the mother accused of child abuse, told numerous lies about Plaintiff, which lies DA Carrie Rasmussen knew were lies, but allowed the testimony.

313) Plaintiff has suffered tremendous stress since she received the Stalking information from the District Attorney, has spent many hours locating information in response to the allegations made, as well as the financial loss in paying her attorney, and lost profits from her business.

314) The Stalking Action was meritless and was dismissed on March 21, 2023, after the DA investigated for over 18 months and found no evidence against Plaintiff.

315) Defendants have continued to give public misrepresentations of fact about Plaintiff, knowingly and intentionally trying to injure Plaintiff's reputation and character, by repeatedly lying about or misrepresenting the actions taken by Plaintiff, from at least February, 2020 to December, 21, 2021 at the hearing in the Stalking Action.

316) Plaintiff learned after the December 21, 2021 hearing that DHS was considered in this action as a "victim" whom Plaintiff was "stalking" based on the finding of *"Mental Injury"* among other factors. However, the finding by DHS of *"Mental Injury"* was on appeal at the time, and since the hearing was held, the finding of *"Mental Injury"* by DHS was reversed by the DHS Central Office.

317)    Defendant Saul Vences of DHS testified at the December 21, 2021 hearing, and had

knowledge that Plaintiff had an appeal pending with DHS concerning the May 10, 2021 DHS

Decision and July 22, 2021 DHS Decision, which appeal Plaintiff won in the January 19, 2022

DHS Decision.

### RECORDS NOT PROVIDED TO PLAINTIFF – DENIED DUE PROCESS BY DHS

318)    Plaintiff has good cause to believe that DHS used the case number 343095 in its

investigation and decisions against Plaintiff, including the first DHS Decision against Plaintiff

made May 10, 2021, in order to prevent Plaintiff from seeing much of the file, in order to

undermine Plaintiff's appeal of the May 10, 2021 DHS Decision (which Plaintiff did appeal, and

DHS reversed the "Mental Injury" finding – see above).

319)    DHS No. 343095 was opened for Greta Willis, nka Greta Sanchez, and DHS intentionally

put the records concerning the DHS Investigation Against Plaintiff, in DHS No. 343095, to

severely limit Plaintiff's access to *any* records in DHS No. 343095, including the *"Assessment

completed 03/18/21"* that is cited to in all the DHS decisions.

320)    Plaintiff began gathering records relevant to this matter in late 2018, and continued to

gather documentation through the trial in the Custody Case that concluded in October, 2020.

Plaintiff amassed a large quantity of documentation, including many DHS reports, police reports,

medical reports from several medical providers, therapy reports, and similar documentation.  Mr.

Allen gave Plaintiff many documents, including documentation from the Juvenile Case, and

Plaintiff herself made public records requests to obtain all the documentation she gathered and

has maintained to this day.

321)    Before the May 10, 2021 DHS Decision, issued in DHS No. 343095, Plaintiff requested

records from DHS and other agencies, and was denied requests for records by DHS.

322) Following the May 10, 2021 DHS Decision, and pursuant to the rules allowed a person against whom DHS issues a decision, Plaintiff requested records from DHS.

323) Plaintiff sent an email to Defendant Vences of DHS dated June 21, 2021 requesting records from DHS. Defendant Vences stated that after *"reviewing your request and consulting with my supervisor, the direction I have is to share the following link with you."*

324) DHS would not provide the records and Plaintiff made a request through the link given by Defendant Vences on behalf of DHS, which is the general DHS public records request.

325) On September 13, 2021, Plaintiff sent an email to District 9 CPS Paralegal Jamie Radcliffe, requesting records including the *"Assessment Completed 03/18/21."* No records were produced responsive to this request.

326) DHS ignored Plaintiff as if she was not involved or a "party" to DHS No. 343095 under which case number all the DHS Decisions were issued against Plaintiff, and even after the May 10, 2021 DHS Decision and finding against her, based on the records they stated they were relying upon, and after the July 22, 2021 DHS Decision.

327) Plaintiff specifically requested the *"Assessment Completed 03/18/21"* from DHS, but was not given it to review by DHS. It is critical to the Washington County Case, and this matter, that Plaintiff be able to review all documentation in the file of the DHS Investigation Against Plaintiff, and any other documentation used by DHS in making any and in making all of the DHS Decisions against Plaintiff.

328) The DHS Decisions cite to documentation including medical reports, law enforcement, case history, witness statements, but Plaintiff was not provided *any* of them by DHS.

329) After being denied records by DHS (even as an "accused" party), Plaintiff filed a petition with the Oregon Attorney General, who ordered DHS to produce the assessment. DHS sent Plaintiff a DHS assessment authored by Defendant Vences that is heavily redacted.

330)    Nearly all of the documentation cited by DHS in the DHS Decisions and Final Order has

not been provided to Plaintiff, including the *Assessment Completed 03/18/2021*.  A portion of the

"case history" has been provided, but not all the relevant and discoverable documentation in the

file of DHS No. 343095 has been provided to Plaintiff, and not all of the documentation listed in

the Final Order.

331)    Plaintiff has only seen a portion of the case history that is redacted; thus, the larger part of

the record used against Plaintiff and the document titled in each of the DHS Decisions as

*"Assessment Completed 03/18/2021"* was not provided by DHS to Plaintiff at this time, and

Plaintiff did not at the time have the opportunity to refute any of the claims made or "facts" as

DHS has not ever provided any written or oral findings of fact, or any actual facts, against

Plaintiff, only the blanket conclusions.

332)    Plaintiff appealed each of the DHS Decisions, resulting in a reversal of the finding of

"Mental Injury" to a finding of "no probably cause" for mental injury (see 01/19/22 DHS

Decision).

333)    The DHS Decisions are critical to the damages suffered by Plaintiff.

334)    In each of the DHS Decisions, it relied upon a document titled *"Assessment Completed*

*03/18/2021."*

335)    Plaintiff repeatedly requested that DHS send a copy of the "Assessment Completed

03/18/2021" but DHS refused each of Plaintiff's requests.

336)    DHS and the other agencies were required to produce documentation to Plaintiff after the

May 10, 2021 DHS Decision, but instead, DHS refused to produce one page of evidence, or

document DHS titled in each of the DHS Decisions as the *"Assessment Completed 03/18/21."*

337)    After DHS refused to send records to Plaintiff in 2021, Plaintiff sought DHS records

through a Petition for Public Records Disclosure Order dated November 13, 2021.

338)     Plaintiff's petition was reviewed by the Oregon Department of Justice, and Deputy

Attorney General Frederick M. Boss advised Plaintiff in a letter dated November 22, 2021, that

DHS had "determined" it could disclose an "assessment" to Plaintiff (the "Boss Letter"), as

follows:

> *"Your petition explains that on September 8, 2021, several months after DHS denied your records request, you requested DHS conduct a Central Office Review of one assessment. In light of this new information, Ms. LeFore informed us that **DHS has determined** that it can now **exercise its limited discretion to disclose that assessment and DHS is preparing to produce it to you.** DHS may redact information from the confidential assessment that it determines to be exempt from disclosure under ORS 419B.035."* (Emphasis added.)

339)     DHS only "determined" that it could disclose an "assessment" to Plaintiff, only because

Plaintiff filed the petition for records with the Attorney General – otherwise, DHS has denied all

of Plaintiff's requests, made before the time she filed an appeal of a DHS Decision, or after the

appeals were filed.

340)     Prior to issuance of the Final Order on May 22, 2022, DHS did not produce any

documentation to Plaintiff except after Plaintiff filed the petition, as explained in the Boss Letter.

341)     Plaintiff received a DHS assessment (with redactions) that as explained in the Boss

Letter, that Plaintiff was allowed to have, and the assessment was not marked "confidential."

342)     DHS took no care as to confidentiality concerning the name of Child, as the name of

Child appears 342 times in the assessment produced by DHS directly to Plaintiff.

343)     Plaintiff has the authority of a ruling by the Deputy Attorney General of the Oregon

Department of Justice, once she filed the appeal of the 1st DHS Decision, for access to

documentation that was used against her by DHS, to be produced with redactions and as non-

confidential documents that Plaintiff can use in her defense, or otherwise.

344)    Although the Attorney General ruled that Plaintiff has the right to the records from DHS

under ORS 419B.035, the assessment against her and all supporting documentation, without any

confidential designation, and allowing for redaction of PPI, etc. – in the Washington County

DHS Case, DHS produced all pages marked as confidential, and the redactions are far more than

PPI, or names of callers – entire pages are redacted.

345)    The withholding of records, or the over-redaction of information, or the making entire

records confidential that should not be entirely confidential, are all examples of DHS depriving

Plaintiff of her due process rights for access to the documents and justice.

346)    In response to the Public Records Order issued by the Attorney General, DHS sent an

assessment done by Defendant Saul Vences to Plaintiff, that included only one report, that was

heavily redacted.

347)    Plaintiff received only a portion of the DHS file, and not the document that DHS titled

*"assessment completed 3/18/21"* that is cited in all the DHS decisions dated May 10, 2021, July

22, 2021, January 19, 2022, and in the Final Order dated May 10, 2022.

348)    The Final Order states:

> "A review was held and it was decided that there is reasonable cause to believe that
> you are responsible for the threat of harm of [Child].
>
> "This decision was based on the following: **The documentation, including medical and
> mental health records, law enforcement reports, case history, and witness statements**
> supports that your persistent questioning of [Child] put him at risk of being significantly
> harmed by you." (Emphasis added.)

349)    After the 1st DHS Decision, Plaintiff requested the documentation upon which it had

made its decision, including the documentation listed in the 1st DHS Decision, the 2nd DHS

Decision, the 3rd DHS Decision and Final Order that DHS claimed the "decision was based on."

350)    DHS never produced any of the documents it relied on during the first two (2) appeals

filed by Plaintiff, and then produced the "assessment" against Plaintiff only after Plaintiff

petitioned the Attorney General and received the ruling from Mr. Boss.

351)    DHS finally produced some (but not all) of these documents in the Washington County

Case, but as confidential and heavily redacted beyond what was allowed under the SPO signed in

the DHS Case (per the negotiations), and what is allowed under Oregon law for a person charged

by DHS with causing *"Mental Injury"* or *"Threat of Harm"* to a child, as DHS charged Plaintiff

here, yet failed to produce records to Plaintiff in a timely manner.

352)    Plaintiff has good cause to believe that DHS employees have been instructed to not give

records to Plaintiff, despite Plaintiff's valid record requests for relevant and discoverable

documentation, despite her status as a party who appealed an adverse ruling, and despite the

Attorney General's ruling by the Deputy Attorney General, Mr. Frederick M. Boss.

353)    Due to the actions of Defendants, Plaintiff has been denied her due process rights of

having the right to review any, and all, of the evidence being used against her.

354)    In the Washington County Case, in response to discovery requests, DHS stated through

its attorney Mr. David Hall, Senior Assistant Attorney General at DOJ that the "Assessment

Completed 3/18/21" is actually the October 27, 2020 Assessment by Defendant Vences.

355)    In particular, Mr. David Hall stated the following:

> "Respondent wishes to clarify that the Assessment to which it believes Plaintiff is
> referring is the "10/27/20 Assessment", which was completed on March 18, 2021.
> Respondent titles and refers to Assessments by the initial report date and not the
> completion date. Assuming that Plaintiff's request refers to the "10/27/20
> Assessment", Respondent admits." (08/04/22 Response to Request for Admissions)

356)    DHS was admitting the assessment cited in the DHS Decisions, the *"Assessment*

*Completed 3/18/21"* is actually the assessment that was began on 10/27/20, by Defendant

Vences.  This was produced by DHS only after Plaintiff had filed the Petition for Public Records

Disclosure with the Attorney General in November of 2021, after Plaintiff had already filed the appeal to the Central Office.

357)    The "assessment" by Defendant Vences, which was the primary document used against Plaintiff and cited in all the DHS Decisions, was not available previously to Plaintiff, in violation of her due process rights and requirements under CAPTA reporting, that were deprived by DHS, as "clarified" by the attorney for DHS in the above-quoted response to Plaintiff's Request for Admissions ("RFA") in the Washington County Case.

358)    In the same Response to Plaintiff's RFA, DHS provided the following excuse or rationale, and also misrepresents what happened concerning the Oregon Attorney General's ruling about DHS producing the "assessment" used against Plaintiff:

> **REQUEST FOR ADMISSION NO. 3:** Admit the DHS did not give the "03/18/21 Assessment" to Plaintiff after Plaintiff filed a Petition for Public Records Order with the Oregon Attorney General, and the AG ordered DHS to provide the documentation. The relevant documents was filed by Plaintiff as SUPP-184 to SUPP-190.
>
> **RESPONSE:** Respondent object to this request as vague and compound. Subject to and without waiving said objections, **Respondent denies that the Attorney General ordered DHS to provide documentation**. Respondent denies that it did not provide Plaintiff with a redacted copy of the 10/27/20 Assessment.  (Emphasis added.)
> --------------------------------------------------------------------
> **REQUEST FOR ADMISSION NO. 4:** Admit the DHS has never allowed Plaintiff the ability to review the "03/18/21 Assessment" in any format.
>
> **RESPONSE:** Respondence objects to this request as vague. Assuming that Plaintiff's request refers to the "10/27/20 Assessment", **Respondent denies**.

359)    While the AG did not "order" DHS to provide the documentation, it gave the explanation, or excuse, given to it from DHS, that they "have determined that it can now exercise its limited discretion to disclose that assessment" – when in reality, DHS would never have produced the assessment unless Plaintiff had petitioned the Attorney General.  This was another invalid excuse by DHS as to why they denied Plaintiff's civil rights.

## DHS VIOLATIONS OF PLAINTIFF'S CIVIL RIGHTS

360)    DHS violated several provisions of the OAR and ORS, procedurally and substantively.

The local offices of DHS in Hood River and District 9 violated these laws, and the same ones

who found *"Mental Injury"* which the Central Office of DHS reversed.

361)    The Central Office of DHS' ruling effectively deemed the decisions by Hood River DHS

and DHS District 9 (in The Dalles) to be wrong decisions, as both were arbitrary and capricious

DHS decisions at the local level, based on the local DHS Investigation Against Plaintiff.

362)    DHS Central Office found that the Hood River and The Dalles offices both made the

wrong conclusion in the finding against Plaintiff of committing *"Mental Injury."*

363)    Thus, all the actions of the Hood River and The Dalles DHS offices are arbitrary and

capricious against Plaintiff, highly questionable, making their subjective opinions not worthy in

both the investigation they conducted, and their two flawed DHS Decisions.  The Central Office

decision in the Final Order was abuse of discretion, based on a lack of substantial evidence.

364)    DHS deprived Plaintiff of her civil rights including, but not limited to:

  a)  **DUE PROCESS:** Not allowing Plaintiff access to the documents DHS claims it used
      in making its findings and conclusions against Plaintiff.

  b)  **DUE PROCESS:** DHS not interviewing Plaintiff directly, or witnessing Plaintiff and
      Child's relationship and interactions, as required.

  c)  **DUE PROCESS:** Not following Oregon law in its investigation, including advising
      Plaintiff of her legal rights and responsibilities while the investigation was being
      conducted by DHS, as required by CAPTA.

  d)  **DUE PROCESS:** Not following Oregon law by issuing a Central Office decision
      within 60 days, as Plaintiff requested of from DHS, and reminded DHS of their
      requirement, to which DHS never responded (nor did DHS respond to the mandamus
      action).

  e)  **FREEDOM OF SPEECH:** Silencing Plaintiff from providing additional information
      and/or not allowing her to submit information, or disallowing information she did
      send, to silence her speech.

f) **FREEDOM OF SPEECH:** Using information supplied by Plaintiff, or sent by Plaintiff to another agency, against Plaintiff in the DHS Investigation Against Plaintiff, and in the DHS Decisions against Plaintiff. Neither DHS nor anyone else ever claimed Plaintiff made any false statements, or did anything else that would prohibit her freedom of speech rights.

## DHS VIOLATIONS OF OREGON LAW

365) DHS did not follow the requirements in the OAR and ORS, in addition to the biased opinions against Plaintiff that they held, put in the first two DHS Decisions, which were overturned by their own agency in Salem.

366) It was the local DHS offices in Hood River and The Dalles which violated the statutes and laws, which the Central Office apparently relied upon in making the determinations in the 3rd DHS Decision and in the Final Order.

367) The Central Office did not conduct its own investigation, but relied on the documentation sent to it from DHS Hood River-The Dalles. The record provided by Hood River and The Dalles offices, was tainted, and several violations were made in the investigation practices of District 9.

368) The violations of ORS and OAR by DHS is all-inclusive, for all the DHS Decisions, including the 05/10/22 Final Order which relied on the DHS Investigation Against Plaintiff conducted by the Hood River and The Dalles offices of DHS.

369) The finding of *"Threat of Harm"* by the DHS Central Office was based on the (flawed) "DHS Investigation Against Plaintiff" of Hood River and The Dalles, and as adjudicated by the Central Office of DHS (who reversed the *"Mental Injury"* and made the *"Threat of Harm"* ruling).

370) DHS violated the statutes and rules in several categories, including the investigation, the providing of records, in the party status/standing of Plaintiff, and other violations.

371) DHS violated **ORS 419B.005(4)(a)** because they did not make a *"detailed inquiry into or assessment of the safety of a child alleged to have experienced abuse."*

372)   The "investigation" against Plaintiff was not a detailed inquiry, and did not include all the

requirements of thorough investigation.  The result of the DHS Investigation Against Plaintiff

was the May 10, 2021 DHS Decision, which is a *"required finding"* under ORS 419B.026(1)(a)

that the report of child abuse was *"founded"* against Plaintiff for *"Mental Injury."*

373)   The "findings" are discussed above, as well as *"Mental Injury"* – which was reversed by

the Central Office.  The initial *"required findings for investigation conducted"* were for *"mental*

*injury"* which finding was overturned.

374)   Thus, the entire investigation is flawed, and should not have been considered by the

Central Office, and the case should have been dismissed at that level (instead, they made the

*"Threat of Harm"* finding which was not based on any investigation of their own, but only what

the locals in Hood River/The Dalles did, very poorly and in violation of codes and statutes, in

what Plaintiff believes to be an attempt to justify the failures of the lower level DHS offices, to

limit the liability of DHS in this matter).

375)   **ORS 419B.020** requires DHS to immediately cause an investigation to be made to

determine the nature and cause of the abuse of the child, when it receives a report of child abuse.

376)   Given the history of Sanchez and the DHS open case file on Sanchez, DHS No. 343095,

when the first call came from Plaintiff as to child abuse by Sanchez, there should have been red

flags going up at DHS (upon DHS' review of the files of Greta Sanchez or Greta Willis and all

the "child abuse" previously founded against her with her daughter, and twice with Child here).

377)   Plaintiff requested, but never received, the files to determine what true "investigations"

had been made into the reports of injuries to Child made by Plaintiff, or others concerning

injuries to Child, over many months.

378) Following the DHS Central Office's reversal of the *"mental injury"* finding, there should have been an investigation as to *"threat of harm"* by Plaintiff, but the decision was made unilaterally by the Central Office without further investigation.

379) **ORS 419B.023(1)(c)** defines *"Suspicious physical injury"* that includes, but is not limited to: (A) Burns or scalds; (B) Extensive bruising or abrasions on any part of the body; (C) Bruising, swelling or abrasions on the head, neck or face; (I) Multiple injuries of different types; (K) Any other injury that threatens the physical well-being of Child.

380) A review of the record and many photographs show that Plaintiff had good cause, if not overwhelming cause, upon the many "suspicious" injuries to Child she witnessed, to report those injuries to DHS. Child had eight (8) black eyes in an 11-month time span, all while in the care of Sanchez and none of the explanations given by Sanchez matched the injuries.

381) **ORS 419B.023(2)** provides that when DHS *"observes a child who has suffered suspicious physical injury"* and the person *is "certain or has a reasonable suspicion that the injury is or may be the result of abuse"* then DHS must contact the multidisciplinary team described in ORS 418.747, take photographs and conduct a medical examination within 48 hours.

382) ORS 419B.022 to ORS 419B.024 is known as "Karly's Law", and it applies *"each time suspicious physical injury is observed"* by DHS including *"during the investigation of a new allegation of abuse."* DHS did not follow Karly's Law, on several occasions.

383) **ORS 419B.025** provides immunity of person making report in good faith, yet Plaintiff was held liable for reporting injuries she believed to be the result of child abuse.

384) All the reporting by Plaintiff was made in "good faith" based on "reasonable grounds" and should have "immunity" from the CPS finding here – her reports were all based on repeated "suspicious physical injury" to Child.

385)  **OAR 413-015-0115(a)(a)(C)** defines *"Physical Abuse"* as *"...injury which appears to be at variance with the explanation given for the injury..."* Here, on more than one occasion, the bruising and injuries on Child did not match the explanation given by Sanchez.

386)  The DHS Investigation Against Plaintiff was essentially to get rid of Plaintiff by finding something against her – then they tried to "find evidence against her" and either make up false claims, or simply made a "finding" against Plaintiff without any evidence.

387)  DHS violated **OAR 413-015-0420(2)(b)(A)** through **(2)(b)(D)**, requiring face-to-face contact with and interview with the *"non-offending parent or caregiver"* which included Plaintiff, and that did not occur. The same regulations state DHS must interview both parents and caregivers in person, as was practical here and did not occur. Plaintiff was denied the due process rights given in this OAR, and under CAPTA requirements.

388)  In the DHS Investigation Against Plaintiff, DHS did not follow the requirements in the OAR, which resulted in DHS abusing its discretion in the DHS Decisions and Final Order (that were all based on an arbitrary and capricious investigation).

389)  DHS violated OAR 413-015-0422(3) requiring observation as *"CPS worker must observe the alleged victim and the parent or caregiver"* and this did not occur. DHS did not observe Child with Mr. Allen and/or with Plaintiff. All their information is "second-hand" or hearsay as far as the relationship between Plaintiff and Child. The home environs of Plaintiff were not actually "assessed" and if they were they would have found excellent living conditions, very clean and no forms of domestic violence.

390)  DHS violated OAR 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 because the DHS Central Office did not issue a *"Notice of Central Office CPS Founded Disposition Review Decision"* within 60 days of receipt of Plaintiff's Request for Central Office Review.

391)    Plaintiff filed the Request for Central Office Review on September 8, 2021, and the

Central Office Decision was due within 60 days, or by November 8, 2021.  The Central Office

Decision was not issued until January 19, 2022 – 72 days late.

392)    By DHS issuing the Central Office Decision 72 days late, Plaintiff suffered an additional

72 days of pain and suffering, as well as economic damages from having to try and get DHS to

issue the decision in a timely manner.  DHS has knowingly and intentionally continued to delay

the appeal proceedings, which continues to cause Plaintiff daily continued damages, to this day

because the DHS Admin. Case has also been delayed by DHS, and Plaintiff's name is still not

cleared, and she still has not seen Child for over 2-½ years.

### STATUS OF DHS ADMINISTRATIVE CASE IN WASHINGTON COUNTY

393)    The Washington County Case was filed May 20, 2022, only ten (10) days after the May

10, 2022 DHS Final Order, when Plaintiff filed a Petition for Judicial Review ("Petition for

Judicial Review").

394)    Plaintiff filed a Motion to Seal Confidential Information in Records with the Petition for

Judicial Review, asking the Court to seal sensitive information, including the "hundreds" of

photographs of Child that Plaintiff sent to DHS while the injuries were occurring in 2019 and

2020, and which Plaintiff submitted a portion of those photographs in the DHS administrative

appeals, that she filed with the Petition for Judicial Review.

395)    From day one in the Washington County Case, Plaintiff has sought to protect confidential

information from public view.

396)    Plaintiff also filed about 500 pages of documentation that consisted of "the record" of the

case that Plaintiff had obtained on her own – documentation filed in the appeals she had made

since the May 10, 2021 DHS Decision (the 1st DHS Decision), as well as other documentation in

support of her appeals of the DHS Decisions.

397)   Plaintiff sent a First Request for Production of Documents ("1st RFP") on July 5, 2022, a 2nd RFP on Nov. 26, 2022, a 3rd RFP on Dec. 16, 2022, and a 4th RFP on March 20, 2023.

398)   Plaintiff sent DOJ an authorization from Mr. Allen, giving his consent as the father of Child, to allow Plaintiff to receive documents from DHS and other entities.

399)   Plaintiff sent a First Request for Admissions on July 18, 2022 ("1st RFA"), a 2nd RFA on March 20, 2023.

400)   DHS, through its attorney David Hall of the Oregon Department of Justice, filed responses to the RFPs and RFAs.

401)   DHS made three productions in the Washington County Case, on the following dates:

    a)  Oct. 18, 2022:     Produced DHS-0001 to DHS-2108 ("1st DHS Production");
    b)  Feb. 23, 2023:     Produced DHS-2019 to DHS-2655 ("2nd DHS Production); and
    c)  Mar. 07, 2023:     Produced DHS-2656 to DHS-5427 ("3rd DHS Production").

402)   The 1st DHS Production was documents Plaintiff filed in her appeals, many DHS reports that Plaintiff already had, and a few other non-consequential documents Plaintiff had not seen before.

403)   The 2nd DHS Production was mostly what Plaintiff filed, or documents that Plaintiff already had.  There were no documents in this production that brought any significant new information.

404)   The 3rd DHS Production included emails and notice of "MDT Meetings" that Plaintiff had never seen before, but all the people in the emails are people Plaintiff already knew were involved and had taken some action, including in the related juvenile court proceedings wherein Plaintiff had obtained documentation from Mr. Allen who gave the information to Plaintiff to use as she deemed necessary.

405)   In the Washington County Case, DHS has continued to refuse Plaintiff documentation she should have received after the 1st RFP, and were not produced, so Plaintiff sent a 2nd RFP

and a 3rd RFP, and to date, DHS still has not produced all the relevant documentation to which Plaintiff has a right to review in her appeal of the DHS Final Order.

406)    In the Washington County Case, Plaintiff (herself) took the deposition of Multnomah County CPS Caseworker Maleea Briggs on January 27, 2023.  Then the 2nd DHS Production occurred on February 23, 2023.

407)    Defendant Saul Vences was deposed by Plaintiff in the Washington County Case on March 6, 2023.  The next day, on March 7, 2023, DHS (through DOJ) provided the 3rd DHS production of documents, which contained vital emails authored by Vences, which were not available for his deposition.

408)    The delay in the 3rd document production by DHS hampered Plaintiff's due process rights when taking the deposition of Saul Vences.  Plaintiff requested to depose Vences again.

409)    The 3rd DHS Production provided Plaintiff with documentation she had not seen before, and certainly would have used in the deposition of Defendant Vences, as the 3rd DHS Production contained several emails authored by Defendant Vences that were and are detrimental to Plaintiff in the DHS Investigation Against Plaintiff and as used in making the May 10, 2021 DHS Decision.

410)    DHS knowingly sent the 3rd DHS Production after the deposition of Saul Vences, to continue to deprive Plaintiff of her right to access the documents used against her, in violation of her due process rights.

411)    In Defendant Vences' deposition in the Washington County Case, he made statements on the record that he may have done things differently if he knew what he knows today, based on information presented in the deposition by Plaintiff, which information should have been reviewed by DHS in the DHS Investigation Against Plaintiff and the 1st DHS Decision, which relied on the assessment that was authored by Defendant Saul Vences.

412)    DHS advised Plaintiff, in the DHS Case, in August of 2022 that the documents were near

ready to be produced, and only a protective order was necessary. The SPO was entered in

October 2022, and 1st DHS Production in October 2022. Then, only after Plaintiff had to file

additional document requests with DHS, did DHS produce the 2nd DHS Production in Feb. 2023

and 3rd DHS Production in March 2023.

413)    All these acts amount to unnecessary delay on the part of DHS/DOJ. The actions by

DHS in the underlying action, and delays in the litigation, have taken the light away from the

child abuse that occurred and Plaintiff reported, and turned the focus of limited DHS and DOJ

resources against Plaintiff, spending hundreds of thousands of tax payers' dollars in defending

and trying to justify the actions of DHS and its employees.

414)    DHS admitted in response to Plaintiff's Request for Admissions in the DHS Admin. Case

that CGCAC is not a contractor of the state.

415)    In the DHS Admin. Case, and concerning issues in the DHS Case, DOJ has stated that it

is allowed to openly communicate with the attorney for CGCAC, Heather Van Meter, despite the

many acts of misconduct by Heather Van Meter in the CGCAC Case, as her communications

with DOJ attorneys has had a negative impact on the discovery and other events in the DHS

Admin. Case in Washington County.

416)    Upon Plaintiff's complaint to the Oregon State Bar, Heather Van Meter was referred to

OSB Disciplinary Counsel on May 23, 2023. Plaintiff advised DHS' counsel at DOJ of this

event, but it has not deterred DOJ from openly communicating with Van Meter, despite any

conflicts-of-interest.

417)    Plaintiff has questioned the attorneys of both DHS and CGCAC, if they could have

competing interests, because both are liable for the damages caused to Plaintiff; however, it

appears DHS/DOJ and CGCAC/Van Meter have working in conjunction against Plaintiff, planning litigation strategies against Plaintiff.

418)    DHS – Hood River and CGCAC are next-door neighbors and properties adjacent to each other, who work together on a daily basis in the small town of Hood River, Oregon (pop. 8,341 in 2021).  Similarly, the attorneys for DOJ (100 SW Market St.), are next-door neighbors and adjacent to the attorneys for CGCAC at Bullard Law (200 SW Market St.), and the two buildings' properties are connected by a walkway between them, not a street.

419)    The attorneys have completely ignored or disregarded Plaintiff's requests that they not communicate regarding the DHS Case and the CGCAC Case, and stated they may communicate as they desire.  Plaintiff pro se is unsure as to the ethical obligations, and if DHS and CGCAC do have competing liability, then are they allowed to strategize against a plaintiff, to "get their stories straight"?

420)    DHS filed a motion to dismiss and for sanctions claiming Schoene had violated a protective order entered in the DHS Case.  A hearing on the DHS' motion to dismiss or for sanctions, and Schoene's motion for determination of confidential designations and/or modification of the SPO occurred on July 10, 2023.  Judge Theodore E. Sims denied DHS' motion to dismiss or for sanctions, as well as Schoene's motion to modify the SPO.  The DHS Case will move forward with discovery, including a second deposition of Saul Vences.

## INJURIES AND HARM TO PLAINTIFF CAUSED BY DEFENDANTS

421)    Plaintiff developed a very strong love for Child, especially given the abuse he had suffered and the lack of appropriate action by Defendants and other officials in Hood River County.

422)    Plaintiff has not seen Child since Christmas of 2020.  Each day Plaintiff suffers in not seeing Child, as her emotions are drained and the resulting mental depression.

423)    Plaintiff suffers from not knowing if Child is being taken care of properly by Mother, and if he is still being abused, which Plaintiff suspects is the case and it causes her even more mental and emotional pain.

424)    During the time when Plaintiff was witnessing the injuries to Child, repeatedly, and she believed nothing was being done to help him by Defendants and/or any other public agency or official, it hurt Plaintiff deeply as she felt frustrated at the systems, and helpless, while at the same time empathizing for Child's physical and mental/emotional well-being, because he was suffering and Plaintiff was trying to stop the suffering, only to be thwarted by the Hood River County systems that were unduly influenced by Defendants.

425)    DHS intentionally defamed Plaintiff's character and reputation in the DHS Investigation Against Plaintiff, resulting in the DHS Decisions which were severely detrimental to Plaintiff's emotional, mental and physical health.

426)    Defendants knowingly and intentionally gave false information to others about Plaintiff, which information harmed Plaintiff, through defaming Plaintiff's character and reputation, unduly influencing others such as Robin Henson of CGCAC, into making findings against Plaintiff for "over-reporting" of injuries, so DHS would find have the local children's advocacy center also finding against Plaintiff, in order to justify DHS' decision against Plaintiff.

427) Plaintiff believes the Defendants knowingly and intentionally tried to split up Mr. Allen and Plaintiff, trying to remove Plaintiff from the Child's life, to have control of the Mr. Allen.

428) Defendants wanted to instill fear into Mr. Allen that he would lose his child, by telling Mr. Allen to advise Plaintiff to not report any injuries, even if there were obvious injuries.

429) Defendant DHS, and others, took proactive measures to threaten Mr. Allen and plant in his mind, false information. For example, that if Plaintiff continued to report the injuries to Child to DHS, that he could be facing loss of custody due to the reporting by Plaintiff.

430) As a result of the actions of Defendants against Plaintiff, Plaintiff was charged with criminal stalking by Hood River County District Attorney Carrie Rasmussen, and a criminal public record of Plaintiff was made, causing severe mental, emotional and physical damage to Plaintiff, as well as that of her business and ability to expand her business.

431) Due to the actions of Defendants, Plaintiff has suffered from the following:

    a) Generalized anxiety disorder ("anxiety").

    b) Loss of sleep.

    c) Loss of appetite.

    d) High anxiety resulting in vital organs being severely damaged, requiring ongoing medical attention, including surgery to remove a cyst that had developed due to the stress of the events alleged herein.

    e) Requirement for mental health therapy, for mental health disorders.

    f) Requirement to see doctors for internal medical issues caused by the stress.

## FEDERAL CAPTA PROGRAM / FUNDING / REQUIREMENTS / EVALUATION

432)    The US federal government enacted the Child Abuse Prevention and Treatment Act of

1974, as amended and reauthorized ("CAPTA"), to allow for states to apply for federal funding

to assist in child abuse prevention and treatment.

433)    CAPTA's legislative history is summarized by the federal government as follows:

> *"The key Federal legislation addressing child abuse and neglect is the Child Abuse Prevention and Treatment Act (CAPTA), originally enacted on January 31, 1974 (P.L. 93-247). This act has been amended several times and was last reauthorized on December 20, 2010, by the CAPTA Reauthorization Act of 2010 (P.L. 111-320). It was amended in 2015, 2016, and 2018, and most recently, certain provisions of the act were amended on January 7, 2019, by the Victims of Child Abuse Act Reauthorization Act of 2018 (P.L. 115-424).*
>
> *"CAPTA provides Federal funding and guidance to States in support of prevention, assessment, investigation, prosecution, and treatment activities ..." (Emphasis added.)*
>
> *\*\*\*\*\**
>
> *"The law amends section 106(b)(2)(B)(vii) of CAPTA to provide immunity from civil and criminal liability (it previously provided immunity from only prosecution) for people who make good-faith child abuse or neglect reports or who provide information or assistance, including medical evaluations or consultations, in connection with a report, investigation, or legal intervention pursuant to a good-faith report of child abuse or neglect."*
>
> (Emphasis added; https://www.childwelfare.gov/pubpdfs/about.pdf)

434)    CAPTA established the Office of Child Abuse and Neglect within the DHHS (§5101), an

Advisory board on child abuse and neglect (§5102), a national clearing house for information

related to child abuse (§5104), research and assistance activities (§5105)

435)    CAPTA contains provisions on the following under §§ 5106, and 5107, 5108:
- §5106 – Grants to States, Indian tribes or tribal organizations, and public or private agencies and organizations
- §5106a – Grants to States for child abuse or neglect prevention and treatment programs
- §5106c – Grants to States for programs relating to investigation and prosecution of child abuse and neglect cases
- §5106d – Miscellaneous requirements relating to assistance
- §5106e – Coordination of child abuse and neglect programs.
- §5106f – Reports
- §5108 – Monitoring and oversight

436)   DHHS advises that CAPTA was created for states such as Oregon to improve the child

protective systems ("CPS"), and gives information on state grants, as follows:

> *"Child Abuse Prevention and Treatment Act (CAPTA) State Grants*
>
> *"Program Description*
>
> *"This program provides funds for States to improve their child protective service systems (CPS). CAPTA has been amended several times ... This program assists states in improving:*
>
> - *"Intake, assessment, screening, and investigation of child abuse and neglect reports;*
>
> - *"Risk and safety assessment protocols;*
>
> - *"Training for child protective services workers and mandated reporters;*
>
> - *"Programs and procedures for the identification, prevention, and treatment of child abuse and neglect;*
>
> - *"Development and implementation of procedures for collaboration among child protection services, domestic violence, and other agencies; and*
>
> *"Program Highlights*
>
> *"Under this program, states perform a range of prevention activities, including addressing the needs of infants born with prenatal drug exposure, referring children not at risk of imminent harm to community services, implementing criminal record checks for prospective foster and adoptive parents and other adults in their homes, training child protective services workers, protecting the legal rights of families and alleged perpetrators, and supporting citizen review panels. CAPTA requires states to convene multidisciplinary teams to review the circumstances of child fatalities in the state and make recommendations."*
>
> https://www.acf.hhs.gov/cb/grant-funding/child-abuse-prevention-and-treatment-act-capta-state-grants

437)   CAPTA grants may be awarded for items including training programs for persons such as

Oregon DHS caseworkers, as follows:

a) For *"the training of professional and paraprofessional personnel in the fields of ... social work and child protection ..."* (Emphasis added; 42 USC §5106(a)(1)(A).)

b) For *"the training of personnel regarding the legal duties of such personnel and their responsibilities to protect the legal rights of children and families."* (Emphasis added; 42 USC §5106(a)(1)(G).)

c) For *"improving the training of supervisory and nonsupervisory child welfare workers."* (Emphasis added; 42 USC §5106(a)(1)(I).)

438)    CAPTA requires DHHS to conduct an evaluation of a grant request under §5106, which

includes grant applications from states, as follows:

> *"In making grants for projects under this section [§5106 grants to states, etc.], the Secretary shall require all such projects to be evaluated for their effectiveness. Funding for such evaluations shall be provided either as a stated percentage of a demonstration grant or as a separate grant or contract entered into by the Secretary for the purpose of evaluating a particular demonstration project or group of projects. In the case of an evaluation performed by the recipient of a grant, the Secretary shall make available technical assistance for the evaluation, where needed, including the use of a rigorous application of scientific evaluation techniques."* (42 USC §5106(c).)

439)    Federal funding from CAPTA under 42 USC §5106a(a) is made available to states *"for*

*purposes of assisting the States in improving the child protective services system of each such State"*,

including the following:

   a)   *"the intake, assessment, screening, and investigation of reports of child abuse or neglect."*
        (42 USC §5106a(a)(1).)

   b)   *"Improving legal preparation and representation, including - procedures for appealing and responding to appeals of substantiated reports of child abuse or neglect."*
        (42 USC §5106a(a)(2)(B).)

   c)   *"Case management, including ongoing case monitoring, and delivery of services and treatment provided to children and their families."* (42 USC §5106a(a)(3).)

440)    CAPTA section §5106a(b) contains eligibility requirements, providing eligibility requirements

for states to receive federal funding through the federal CAPTA program, providing: *"a State shall*

*submit to the Secretary a State plan that specifies the areas of the child protective services system*

*described in subsection (a) that the State will address with amounts received under the grant"* which is

known as the *"State Plan."* (42 USC §5106a(b)(1)(A).)

441)    Under 42 USC §5106a(b)(2), the contents of a State Plan submitted require a *"description of*

*the activities that the State will carry out using amounts received under the grant to achieve the objectives*

*of this subchapter"* including the following:

a) 42 USC §5106a(b)(2)(A) provides: *"An assurance that the State plan, to the maximum extent practicable, is coordinated with the State plan ... relating to child welfare services and family preservation and family support services."*

b) 42 USC §5106a(b)(2)(B) provides: *"An assurance in the form of a certification by the Governor of the State that the State has in effect and is enforcing a State law, or has in effect and is operating a statewide program, relating to child abuse and neglect that includes –*

    i. *"(iv) procedures for the immediate screening, risk and safety assessment, and prompt investigation of such reports;*

    ii. *"(vii) provisions for immunity from prosecution under State and local laws and regulations for individuals making good faith reports of suspected or known instances of child abuse or neglect.*

    iii. *"(xviii) provisions and procedures to require that a representative of the child protective services agency shall, at the initial time of contact with the individual subject to a child abuse or neglect investigation, advise the individual of the complaints or allegations made against the individual, in a manner that is consistent with laws protecting the rights of the informant."*

    iv. *"(xix) provisions addressing the training of representatives of the child protective services system regarding the legal duties of the representatives, which may consist of various methods of informing such representatives of such duties, in order to protect the legal rights and safety of children and families from the initial time of contact during investigation through treatment.*

    v. *"(xx) provisions and procedures for improving the training, retention, and supervision of caseworkers."* (Emphasis added.)

442)   Under 42 USC §5106a(b)(2)(D)(ii), a State Plan must have a description of *"the training to be provided under the grant to support direct line and supervisory personnel in report taking, screening, assessment, decision making, and referral for investigating suspected instances of child abuse and neglect."*

443)   Under 42 USC §5106a(b)(2)(E), Oregon's State Plan must have an *"assurance or certification that the programs or projects relating to child abuse and neglect carried out under part B of title IV of the Social Security Act [42 U.S.C. 620 et seq.] comply with the requirements set forth in paragraph (1)."*

## CAPTA REPORTING REQUIREMENTS & OVERSIGHT

444)     To apply for and remain eligible for CAPTA funds, states must submit reports.  See 42

USC §5106f.

445)     Oregon DHS reports to the federal government to ensure the accuracy of services

provided by DHS under CAPTA.

446)     Oregon submits reports to the federal government providing assurance that Oregon DHS

is in compliance with the Federal government's requirements under CAPTA, including

compliance for investigations, assessment, decision making and legal rights and responsibilities,

as well as training of CPS caseworkers and supervisors.

447)     Oregon DHS/CPS is not fulfilling the requirements for which they have provided

assurance of compliance, in order to continue to receive federal funding through CAPTA.

448)     The State Plan was not followed in this case, as shown in the allegations concerning the

DHS Investigation Against Plaintiff, the "CPS Assessment" by Defendant Saul Vences, the DHS

"decision making" in the Founded Dispositions, and failure by Defendant Andy Perez or

Defendant Saul Vences to advise Plaintiff of her legal rights and responsibilities when the

investigation began, or at any time during the DHS Investigation Against Plaintiff.

449)     The federal DHHS in 2016 found many problems with the Oregon DHS system for

preventing child abuse and protecting children.  Plaintiff filed an "Appendix" with her Request

for Review on June 27, 2021, outlining some of the problems found by DHHS in 2016 with the

Oregon system of child abuse prevention, investigations, assessments, the caseworker/cases

ratio, and other problems.

450)     Another problem identified was the use by DHS of algorithms to aide in determinations

DHS was making.  DHS touted this "AI" as a new tool to assist in child abuse prevention.

However, due to problems with the algorithm system, DHS abandoned it on June 30, 2022.

451)    The AI algorithm system was in use when DHS/CPS was investgating Plaintiff, and this system could have been a source of the flawed investigation and erroneous decisions made by DHS as the investigation did not review much of the record submitted by Plaintiff including numerous of photographs of child abuse to Child taken by Plaintiff. The DHS Decisions were based on the flawed investigation which relied in part on the (now abandoned) algorithm system.

### OREGON CAPTA APPLICATION AND THE STATE PLAN

452)    On May 23, 2022, Oregon DHS, Child Welfare Division, requested funds through the US DHHS for: *"Requested Child Abuse Prevention and Treatment Act (CAPTA) State Grant"* in the amount of $1,062,699 (CFS-101, Part 1, Attachment B, OMB #0970-0426; US DHHS, Administration for Children and Families.[2]

453)    The State of Oregon, through Defendant DHS, applied for and accepted federal funds from the federal program (CAPTA), implementing a program or plan through Defendant DHS to fulfill the intent of the funding it receives through CAPTA, to prevent and treat child abuse, in the State Plan.

454)    The State Plan includes items such as having a statewide hotline, screening the reporting of child abuse, the initial contact with persons involved, investigations, advising an alleged perpetrator of child abuse of their rights, assessments of reports of child abuse, decision making, and other particulars including an alleged perpetrator of child abuse's legal rights.

455)    Oregon accepted the federal funds through the CAPTA program, to apply to the Oregon Child Welfare System, as administered and carried out by the Child Protective Services ("CPS") of the Oregon Department of Human Services.

---

[2] https://www.oregon.gov/dhs/CHILDREN/Documents/apsr-fy2023-00-budget-request.pdf

456)    Defendant DHS, through CPS, advises the public it conducts "Assessments" as follows:

> "Assessment
>
> "In many cases after screening, a worker with CPS training will conduct a CPS assessment. The worker will talk to the child, the child's caregivers, which may include family members, and others involved with the child such as teachers or medical professionals.
>
> "After an assessment is completed, the information is reviewed to determine whether abuse occurred and whether the child is safe."
>
> https://www.oregon.gov/dhs/CHILDREN/CHILD-ABUSE/Pages/CPS.aspx

457)    CPS advises the public that CPS caseworkers, such as Defendants Vences, Perez and

Campbell, have training in *"all aspects of child abuse"* in accordance with CAPTA, as follows:

> "Training: CPS caseworkers must complete a comprehensive program that covers all aspects of child abuse, including:
> - symptoms of abuse
> - how to screen incoming reports of abuse
> - how to assess the future safety of a child
> - how to conduct an assessment of the family
> - how to interview victims, witnesses and alleged abusers
> - when to ask for law enforcement assistance
> - how to decide if abuse has occurred
> - how to decide if a child is safe
> - how to develop a safety plan
> - when to close a case
>
> "In addition, all CPS supervisors and caseworkers are offered several days of in-service training to continually upgrade their knowledge and skill."
>
> https://www.oregon.gov/dhs/CHILDREN/CHILD-ABUSE/Pages/CPS.aspx

458)    Some of DHS' additional funds from CAPTA was to hire additional caseworkers to get a

1:7 ratio of new assignments per caseworker.

459)    In the Oregon DHS 2023-25 Policy Package for the Governor's Budget, $2,302,362 from

federal funding is allotted for Policy Package number 118, for *"Child Safety,"* stating as follows:

> "Children thrive when they have safe and supportive family structures in which to grow up. According to Oregon's May Child Welfare Progress Report, about 4,000 times every month Child Protective Services staff engage with families to identify whether children are being exposed to an unmanaged safety threat.

> "Key ingredients in achieving our Child Welfare Division's Vision for Transformation are accurate assessments of child safety and in-home support to prevent placements away from family and community, but Child Welfare needs more staff to ensure that every family receives in-depth assessment and that safety threats are accurately identified. Current staffing levels make it difficult for staff to meaningfully engage with families, understand their specific needs, and develop customized safety plans – all tasks that require time, care, and skill.
>
> "Without the staffing necessary to carry out these labor-intensive tasks, we may fail to identify safety issues and support families appropriately in addressing them, thus increasing the likelihood that a child will enter foster care – an often traumatizing outcome that disproportionately affects Black and Native American families.
>
> "A staffing investment is necessary to meet the goal in the Oregon Caseload Ratio Standards that each CPS caseworker is assigned no more than 7 new assessments per month (1:7 ratio). The investment will ensure critical caseworker capacity for family engagement, assessment, safety planning, and ongoing support – helping to make sure that children have the best chance of growing up in a safe and nurturing family."  (Emphasis added; paragraphs added for ease of reading.)
>
> https://www.oregon.gov/dhs/ABOUTDHS/DHSBUDGET/Documents/2023-2025-grb-section-3.pdf

460)     Oregon's 2023-25 Policy Package has further information on the need for additional caseworkers for accurate and timely completion of assessments.

461)     Due to the overload of cases for caseworkers, there is a lack of training, lack of adequate time to conduct assessments and in making decisions, as required by CAPTA.

### OREGON'S STATE PLAN AND ONGOING VIOLATIONS BY DHS/CPS

462)     Oregon's State Plan designated DHS, through the Child Protective Services ("CPS") as the state authority responsible to establish and maintain standards for child abuse investigations, founded dispositions, and protection of civil rights of the child, the family, and the alleged perpetrator of child abuse.

463)     DHS promulgated standards for investigations of child abuse, for making founded dispositions, for training and supervision of individual DHS caseworkers, in specific topics related to child abuse prevention and treatment.

464)    All DHS/CPS caseworkers are required to possess and demonstrate certain abilities, characteristics and qualifications that bear on child safety.  These include sound judgment, responsibility, stability, and emotional maturity.

465)    DHS violated Oregon law in the investigation and assessment processes, as well as denying Plaintiff's civil rights by not advising her of her rights when the investigation began (or at any time during the investigation), not allowing her access to records being used against her, not being able to represent herself in any capacity during the DHS investigation.

466)    No CPS representative ever spoke to Plaintiff, in a reasonable manner, for the allegations under which she was under investigation by DHS (for "Mental Injury"), and DHS never communicated to Plaintiff in writing, by email or text, although they had Plaintiff's email and text number, that she was under investigation.

467)    DHS never advised Plaintiff of any of her legal rights at any time during the DHS Investigation Against Plaintiff.

468)    The first time Plaintiff was advised of any legal rights, the right to speak for herself, the right to defend her actions, was after the DHS – Hood River office issued a Founded Disposition on May 10, 2021 finding *"Mental Injury"* by Plaintiff to Child.

469)    Upon her appeal, the DHS Central Office overturned the finding of *"Mental Injury"* made by DHS – Hood River as confirmed by DHS – District 9.  All the DHS Decisions, including the DHS – Central Office decisions, were based on the DHS Investigation Against Plaintiff.

470)    When the DHS Investigation Against Plaintiff and DHS Assessment were performed concerning Plaintiff, the caseworker to new cases ratio was not 1:7, as DHS has admitted it did not have enough caseworkers, and is still today seeking more caseworkers through budgeted funds in the 2023-25 Oregon budget (supported in part by federal CAPTA funds).

## ECONOMIC DAMAGES

### A. ACTUAL DAMAGES

471)    Due to the actions of Defendants, Plaintiff required medical services.

472)    Plaintiff's out-of-pocket expenses and other costs for the medical services is currently unknown and increasing monthly, in an amount to be determined at trial.

473)    Due to the actions of Defendants, Plaintiff required mental health therapy services.

474)    Plaintiff's out-of-pocket expenses and other costs for the mental health therapy services is currently unknown and increasing monthly, in an amount to be determined at trial.

475)    Plaintiff has spent a total of $200,000 in battling these actions by DHS (and others in related cases).  Of the $200,000, some is included in the Custody Case, as well as the Stalking Action and the CGCAC Case, all which are related and all dependent upon the actions taken by Defendants, as alleged herein.  For if not of the wrongful acts of Defendants, Plaintiff would not have had to pay any of the $200,000 she has spent, and would not have had to endure all the emotional pain and suffering.

476)    The amount of actual damages attributable solely to Defendants is approximately 50% of the total actual costs Plaintiff has incurred, or **$100,000**.

### B. LOST PROFITS

477)    Due to the actions of Defendants, Plaintiff was unable to perform near her normal level in her business.

478)    The actions of Defendants and other related parties described herein created a requirement for Plaintiff to expend an inordinate amount of time, energy and emotion on making the case for Child, and in appealing the DHS decisions to have them overturned, which decisions were overturned in the January 19, 2022 DHS Decision, and the DHS Final Order is currently on appeal in the DHS Admin. Case in Washington County.

479)    Due to the actions of Defendants, Plaintiff had less time for her business, less time for

clients, less time for marketing.  This resulted in lost business and lost profits for Plaintiff.

480)    The total amount of the actual lost profits is approximately **$14,000** for the month of

December 2020, due to the actions of Defendants, when Plaintiff was essentially unable to work

due to the depression and adjustment to new medications.

481)    Each month since June, 2021, Plaintiff has continuously worked on the administrative

appeals or the Washington County Case, losing business profits in the amount of $3,000 per

month.  The total time period from June 2021 until filing of the Complaint in May, 2023 is 24

months.  The total amount of lost profits is **$72,000**.

482)    Total lost profits Plaintiff has suffered due to the actions of Defendants is **$86,000**.

## C. LOSS OF BUSINESS OPPORTUNITIES

483)    Plaintiff moved her business, PDX Hair Extensions, to a new location in October, 2020,

leasing 6,000 sq. ft. of space in the Pearl District in NW Portland.

484)    Plaintiff uses approximately 3,000 sq. ft. of the leased space for her own business, and

was planning on leasing portions of the remaining space to other businesses, for a profit.

485)    Plaintiff had plans to market and promote the additional spaces for lease, but was unable

to do so based on the actions of Defendants as alleged in this First Amended Complaint.

486)    Due Defendants' actions, Plaintiff's business expansion in Portland was put on hold, as

Plaintiff has not been able to put the systems in place, and the logistics for leasing the spaces.

487)    Plaintiff estimates the leased spaces would have brought her approximately $6,000 per

month, from June, 2021 to current, for a total of **$144,000** as of May, 2023.

**D. DAMAGE TO REPUTATION HARMING BUSINESS OPPORTUNITIES**

488)    In Plaintiff's industry, her reputation is critical, as the owner of her own business, in a

highly competitive hair-extensions' market in Portland, Oregon.

489)    Due to the damage to Plaintiff's reputation caused by Defendants, Plaintiff's business

ventures were delayed, and potentially irreparably damaged should Plaintiff discover lost

business profits or ventures due to the actions by Defendants, including, but not limited to,

defaming Plaintiff's reputation in the Portland-business community, in the beauty salon industry,

and otherwise the embarrassment Plaintiff has encountered due to the actions of Defendants.

490)    The amount of damages caused by Defendants, for injury to her business reputation, is

unknown, estimated at **$100,000**.

491)    The total economic damages for (a) Actual Damages ($100,000); (b) Lost Profits

($86,000); (c) Loss of Business Opportunities ($144,000); and (d) Damage to Reputation

($100,000), for a total of **$430,000**.

## NON-ECONOMIC DAMAGES

492)    Due to the actions of Defendants alleged herein, Plaintiff has suffered the following:

    a)  Pain.

    b)  Mental suffering.

    c)  Emotional distress.

    d)  Humiliation.

    e)  Injury to reputation.

    f)  Inconvenience and interference with normal and usual activities apart from gainful
       employment.

493)    The actions by Defendants alleged herein have caused Plaintiff to suffer non-economic

damages in the amount of **$1,000,000**, or to be determined at trial.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### 42 USC §1983 - Deprivation Fifth and Fourteenth Amendment Right of Due Process

494)    Plaintiff incorporates all prior paragraphs as though fully realleged.

495)    42 USC §1983 provides in relevant part that every person who under color of any statute, ordinance, regulation, custom, or usage, subjects or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proceeding for redress.

496)    Plaintiff had an established constitutional right to due process of law after Plaintiff appealed the May 10, 2021 DHS Decision against Plaintiff.

497)    Defendants owed a duty to Plaintiff under Oregon law, to afford Plaintiff all her due process rights in the investigation it conducted, in the assessment, and once Plaintiff filed an appeal of the May 10, 2021 DHS Decision.

498)    Specific due process violations by Defendants include, but are not limited to, the following:

   a)  Failing to allow Plaintiff access to the documents Defendant DHS claims it used in making its findings and conclusions against Plaintiff.

   b)  Failing to interview Plaintiff directly, or witnessing Plaintiff and Child's relationship and interactions, as required by Oregon law.

   c)  Failing to follow all procedures in the ORS and OAR in its investigation.

   d)  Failing to follow Oregon law by not providing a decision within 60 days, as Plaintiff requested of from DHS, and reminded DHS of their requirement, to which DHS never responded (or to the mandamus action).

   e)  Failing to provide documentation due to Plaintiff in discovery in the Washington County Case in a timely manner, causing unnecessary delay.

499)    During the DHS Investigation Against Plaintiff, Defendant DHS, and Defendants

Campbell, Perez and Vences all failed to follow Oregon law for CPS investigations and deprived

Plaintiff of her due process rights.

500)    Defendants DHS, and individual Defendant Vences, and other individual defendants,

failed in properly preparing the assessment against Plaintiff as required by Oregon law, depriving

Plaintiff of her due process rights.

501)    Defendants DHS, and individual Defendant Tobar, and other individual defendants,

failed in properly preparing the May 10, 2021 DHS Decision against Plaintiff as required by

Oregon law, depriving Plaintiff of her due process rights.

502)    Once Plaintiff had filed her first appeal with DHS, Defendant DHS was required to

produce the assessment it used against her when Plaintiff requested it instead of denying her

request, as DHS was required exercised its limited discretion to disclose the assessment to

Plaintiff under ORS 419B.035.

503)    DHS failed to produce documents it relied upon in making the 1st DHS Decision, the 2nd

DHS Decision, the 3rd DHS Decision and the Final Order, depriving Plaintiff of her

constitutional right to due process in the administrative appeals.

504)    Only after Plaintiff petitioned the Oregon Attorney General's Office, several months after

receipt of the May 10, 2021 DHS Decision, did DHS release the assessment to Plaintiff, as

explained in the Boss Letter.

505)    DHS failure to produce required documentation in a timely manner deprived Plaintiff of

her constitutional right to due process during the administrative appeals, because Plaintiff did not

have documentation available to her, that should have been made available to her by Defendant

DHS, when preparing her continued appeals of the DHS decisions.

506)     DHS continued to refuse to produce the documentation in the Washington County Case, until Plaintiff had to submit additional requests for production of documents, and only then did DHS produce some, but not all, of the documents it is required to produce depriving Plaintiff of her constitutional right to due process through production of documents in a timely manner, and without intentional delay.

507)     Plaintiff has good cause to believe that DHS in the DHS Admin. Case, and CGCAC in the CGCAC Case, have strategized against Plaintiff to delay both cases, to wait the outcome of the "Stalking Action" against Plaintiff, filed by Hood River County District Attorney Carrie Rasmussen, the lead Defendant in the CGCAC Case, who is the founder and person-in-charge of CGCAC since it was founded in 2009 until today.

508)     If the Stalking Action against Plaintiff had resulted in a conviction, then DHS and CGCAC believed they would have had justification for their tortious actions against Plaintiff, and other misconduct they committed; however, the Stalking Action was dismissed by DA Rasmussen after 18 months of discovery, as there was no evidence against Plaintiff, because the charges were falsely instigated, falsely made, and falsely prosecuted.

509)     DHS did not follow Oregon law for a person charged by DHS with causing *"Mental Injury"* or *"Threat of Harm"* to a child, as DHS charged Plaintiff, by failing to produce records to Plaintiff in a timely manner, depriving Plaintiff of her constitutional right to due process.

510)     Defendant DHS, and individual Defendants Lawing, Tobar, Hughes, Kintner, Campbell, Vences and Perez failed in its investigation to follow Oregon law, by failing to contact Plaintiff, failing to conduct a face-to-face interview, failing to witness Plaintiff's interactions with Child, all which deprived Plaintiff of her constitutional right to due process.

511)     DHS was required under Oregon law to provide a decision within 60 days after Plaintiff filed her Request for Central Office Review, as Plaintiff timely requested from DHS.

512)    Plaintiff inquired of DHS as to their abiding by the 60-day time limit, but DHS never responded.

513)    Plaintiff filed a Petition for Writ of Mandamus in the Oregon Supreme Court in order to get DHS to issue a decision within 60 days, but DHS never responded.

514)    DHS failed to issue a Central Office Decision within 60 days, as required by law.  The request for Central Office Review was filed, by hand-delivery, on September 8, 2021, making the deadline for a decision by November 8, 2021.

515)    DHS did not issue the decision until January 19, 2022 (a total of 133 days – DHS was 72 days late, which continually damaged Plaintiff in the day-to-day pain and suffering inflicted upon her by the actions of defendants herein).  The failure to issue a timely decision deprived Plaintiff of her constitutional right to due process.

516)    Defendant DHS's deprivation of Plaintiff's due process rights was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

### SECOND CLAIM FOR RELIEF
#### 42 USC §1983 - Deprivation of First Amendment Right of Free Speech

517)    Plaintiff incorporates all prior paragraphs as though fully realleged.

518)    During the DHS Investigation Against Plaintiff, Defendant DHS made threats to Father that Defendant DHS would remove Child from Mr. Allen's care if Plaintiff continued to speak out concerning the child abuse and the lack of prevention of the abuse by Defendant DHS.

519)    This act by Defendant DHS effectively silenced Plaintiff from providing additional information and/or not allowing her to submit information, or disallowing information she did send.

520)    The actions by Defendant DHS to silence Plaintiff's speech deprived her of her constitutional right to free speech under the First Amendment to the US Constitution.

521)    DHS used information supplied by Plaintiff, or sent by Plaintiff to another agency,

against Plaintiff in the DHS Investigation Against Plaintiff and in the DHS Decisions against

Plaintiff.

522)    Neither DHS nor anyone else ever claimed Plaintiff made any false statements.

523)    DHS claimed Plaintiff had *"over-documented"* and *"over-reported"* when there are no

such defined terms in Oregon law.

524)    Defendant DHS's deprivation of Plaintiff's freedom of speech right was a cause of

Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

### THIRD CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

525)    Plaintiff incorporates all prior paragraphs as though fully realleged.

526)    Defendants acted intentionally and recklessly to inflict Plaintiff with severe emotional

distress, or knew that their actions were certain or reasonably certain to inflict distress, by

subjecting Plaintiff to, among other things, depriving Plaintiff's civil rights including due process

and freedom of speech, and committing acts of negligence, negligence *per se* and defamation of

Plaintiff's reputation, in the DHS Investigation Against Plaintiff and making the DHS Decisions

against Plaintiff.

527)    Defendants' actions intentionally targeted Plaintiff, knowing Child is Plaintiff's

sensitivity and weakness.

528)    The conduct of Defendants was extreme and outrageous in the DHS Investigation

Against Plaintiff, in making the DHS Decisions against Plaintiff, and other acts and omissions

alleged herein.

529)    The conduct of Defendants was continuous and repetitive.

530)    The conduct of Defendants was the cause of the injury to Plaintiff, including, but not limited to, the DHS Investigation Against Plaintiff, in making the DHS Decisions against Plaintiff, and other acts and omissions alleged herein.

531)    Defendants targeted a member of a fragile class, Plaintiff, by using Child and their ability to control who sees Child, including Plaintiff, as the instrument to accomplish their goals.

532)    Defendants are common carriers for children's protection services in Hood River County, and the state of Oregon, and upon whom the public relies upon.

533)    Defendants disregarded the likely consequences of their actions, including but not limited to the DHS Investigation Against Plaintiff, the DHS Decisions against Plaintiff, and other acts and omissions alleged herein.

534)    Defendants' actions constituted an extraordinary transgression of the bounds of socially tolerable conduct.

535)    Defendants' actions caused Plaintiff severe emotional distress, including but not limited to anxiety, nervousness, aggravation of Plaintiff's PTSD and anxiety, humiliation, loss of appetite, depression, insomnia, physiological and physical injury, and other emotional harm and damages.

536)    Defendants' actions amounted to negligence by in the DHS Investigation Against Plaintiff, the DHS Decisions against Plaintiff that found *"Mental Injury"* against Plaintiff, or found *"Threat of Harm"* against Plaintiff based on the flawed DHS Investigation Against Plaintiff, and other acts and omissions alleged herein.

537)    The DHS Decisions and founded disposition of "Mental Injury" against Plaintiff were reversed in the January 19, 2022 DHS Decision.

538)    Defendant DHS's intentional infliction of emotional distress was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

## FOURTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

539)    Plaintiff incorporates all prior paragraphs as though fully realleged.

540)    Defendant DHS owed a legal duty to Plaintiff under the circumstances to have an investigation performed in accordance with the laws of the State of Oregon.

541)    Defendant DHS breached the duty owed to Plaintiff by failing to conduct a proper investigation under the laws of the State of Oregon.

542)    Defendant DHS owed a legal duty to Plaintiff under the circumstances to have an assessment performed in accordance with the laws of the State of Oregon.

543)    Defendant DHS failed to conduct a proper investigation or assessment under the laws of the State of Oregon.

544)    The actions of Defendants caused injury to Plaintiff through Defendants' failure to perform the required responsibilities, under Oregon law, knowing their failures would harm Plaintiff, by issuing the 1st DHS Decision, and each subsequent decision against Plaintiff, that resulted in Plaintiff not being able to see Child, for Plaintiff to have a *"Mental Injury"* charge against her and on her record, or a *"Threat of Harm"* charge against her and on her record and all the stigmas attached, as well as legal action against Plaintiff (i.e., the Stalking Action for example), and that Plaintiff would appeal the decisions taking her time and energy as well as the additional stress.

545)    Defendant DHS is liable for its tortious conduct and it is vicariously liable for the tortious conduct of its officers, employees, and agents acting within the scope of their employment or duties.

546)    Each and every act against Plaintiff in the DHS Investigation Against Plaintiff, and/or each and every act of Defendants' failure to stop the child abuse Plaintiff reported, and/or every

denial of Plaintiff's right to receive DHS records, and/or every failure to advise Plaintiff of her civil rights, and/or every written decision against plaintiff, and/or every assessment made against Plaintiff, was a separate occurrence and cause of Plaintiff's injuries and damages.

547)     DHS's duty to protect Plaintiff's rights under Oregon law was non-delegable.

548)     DHS acted negligently and/or recklessly in one or more of the following particulars:

    a) Failing to properly train its employees as to conducting investigations in accordance with Oregon law, including caseworkers Campbell, Vences, Perez.

    b) Failing to properly supervise its employees as to conducting investigations in accordance with Oregon law, including caseworkers Campbell, Vences, Perez.

    c) Failing to properly train its employees as to preparing assessments in accordance with Oregon law, including caseworkers Campbell, Vences, Perez.

    d) Failing to properly supervise its employees as to preparing assessments in accordance with Oregon law, including caseworkers Campbell, Vences, Perez.

    e) Failing to produce records to Plaintiff after Plaintiff filed an appeal of the 1st DHS Decision and after Plaintiff had requested the documentation DHS used in making the 1st DHS Decision.

    f) Failing to produce records to Plaintiff after Plaintiff filed an appeal of the 2nd DHS Decision and after Plaintiff had requested the documentation DHS used in making the 2nd DHS Decision.

    g) Failing to produce records in a timely manner to Plaintiff after Plaintiff filed the Washington County Case and after Plaintiff had requested the documentation DHS used in its investigation and in making all four (4) of the DHS Decisions, including the Final Order.

549)     Defendant DHS's negligence was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

## FIFTH CLAIM FOR RELIEF
### Negligence Against State

550)    Plaintiff incorporates all prior paragraphs as though fully realleged.

551)    Defendant DHS owed a legal duty to Plaintiff under the circumstances to have an investigation performed in accordance with the laws of the State of Oregon.

552)    Defendant DHS breached the duty owed to Plaintiff by failing to conduct a proper investigation under the laws of the State of Oregon.

553)    Defendant DHS owed a legal duty to Plaintiff under the circumstances to have an assessment performed in accordance with the laws of the State of Oregon.

554)    Defendant DHS failed to conduct a proper investigation or assessment under the laws of the State of Oregon.

555)    The actions of Defendants caused injury to Plaintiff through Defendants' failure to perform the required responsibilities, under Oregon law, knowing their failures would harm Plaintiff, by issuing the 1st DHS Decision, and each subsequent decision against Plaintiff, that resulted in Plaintiff not being able to see Child, for Plaintiff to have a *"Mental Injury"* charge against her and on her record, or a *"Threat of Harm"* charge against her and on her record and all the stigmas attached, as well as legal action against Plaintiff (i.e., the Stalking Action for example), and that Plaintiff would appeal the decisions taking her time and energy as well as the additional stress.

556)    Defendant DHS is liable for its tortious conduct and it is vicariously liable for the tortious conduct of its officers, employees, and agents acting within the scope of their employment or duties.

557)    Each and every act against Plaintiff in the DHS Investigation Against Plaintiff, and/or each and every act of Defendants' failure to stop the child abuse Plaintiff reported, and/or every

denial of Plaintiff's right to receive DHS records, and/or every failure to advise Plaintiff of her

civil rights, and/or every written decision against plaintiff, and/or every assessment made against

Plaintiff, was a separate occurrence and cause of Plaintiff's injuries and damages.

558)    DHS's duty to protect Plaintiff's rights under Oregon law was non-delegable.

559)    DHS acted negligently and/or recklessly in one or more of the following particulars:

   a)  Failing to properly train its employees as to conducting investigations in accordance
       with Oregon law, including caseworkers Campbell, Vences, Perez.

   b)  Failing to properly supervise its employees as to conducting investigations in
       accordance with Oregon law, including caseworkers Campbell, Vences, Perez.

   c)  Failing to properly train its employees as to preparing assessments in accordance with
       Oregon law, including caseworkers Campbell, Vences, Perez.

   d)  Failing to properly supervise its employees as to preparing assessments in accordance
       with Oregon law, including caseworkers Campbell, Vences, Perez.

   e)  Failing to produce records to Plaintiff after Plaintiff filed an appeal of the 1st DHS
       Decision and after Plaintiff had requested the documentation DHS used in making the
       1st DHS Decision.

   f)  Failing to produce records to Plaintiff after Plaintiff filed an appeal of the 2nd DHS
       Decision and after Plaintiff had requested the documentation DHS used in making the
       2nd DHS Decision.

   g)  Failing to produce records in a timely manner to Plaintiff after Plaintiff filed the
       Washington County Case and after Plaintiff had requested the documentation DHS
       used in its investigation and in making all four (4) of the DHS Decisions, including
       the Final Order.

560)    Defendant DHS's negligence was a cause of Plaintiff's injury and damage, some or all of

which may be irreparable damage to Plaintiff.

## SIXTH CLAIM FOR RELIEF
### Negligence Per Se Against State

561)    Plaintiff incorporates all prior paragraphs as though fully realleged.

562)    Plaintiff is in a class of people protected by the duty statutorily imposed on Defendants in conducting an investigation, and in performing an assessment, within the governance of Oregon law, including but not limited to ORS 419B.005 to ORS 419B.055 and OAR Chapter 413, and the State Plan.

563)    Defendants owe a statutory duty upon all persons to whom an investigation or assessment may effect, including Plaintiff.

564)    Defendants breached their statutory duty by action or failing to act in accordance with Oregon law governing investigations and assessments, including but not limited to ORS 419B.005 to ORS 419B.055 and OAR Chapter 413, and the State Plan.

565)    The statutes governing investigations and assessments was intended to prevent the type of injury suffered by Plaintiff.

566)    DHS was negligent *per se* in one or more of the following particulars:

a)    Failing to make a *"detailed inquiry into or assessment of the safety of a child alleged to have experienced abuse"* in violation of ORS 419B.005(4)(a).

b)    Failing to immediately cause an investigation to be made to determine the nature and cause of the abuse of the child, when it receives a report of child, in violation of ORS 419B.020.

c)    Failing to recognize *"Suspicious physical injury"* that includes injuries reported by Plaintiff that were ignored by defendants, in violation of ORS 419B.023(1)(c).

d)    Failing to recognize what is a *"suspicious physical injury"* under ORS 419B.023(2) and then failing to contact the multidisciplinary team as required and described in ORS 418.747, failing to take photographs and conduct a medical examination within 48 hours.  This applies *"each time suspicious physical injury is observed"* by DHS including *"during the investigation of a new allegation of abuse."*

e)    Failing to allow Plaintiff immunity, when making good faith reports of child abuse, in violation of ORS 419B.025.

f) Failing to recognize *"Physical Abuse"* as reported by Plaintiff, in violation of OAR 413-015-0115(a)(a)(C).

g) Failing to conduct a face-to-face interview with Plaintiff in its investigation of Plaintiff, in violation of OAR 413-015-0420(2)(b)(A) through (2)(b)(D).

h) Failing to *"observe the alleged victim and the parent or caregiver"* in violation of OAR 413-015-0422(3).

567) If not for the breach of statutory duty by Defendants, injury would not have occurred to Plaintiff.

568) Defendant DHS's negligence *per se* was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

## SEVENTH CLAIM FOR RELIEF
### Violations of Oregon Law and the State Plan by Defendant DHS

569) Plaintiff incorporates all prior paragraphs as though fully realleged.

570) DHS violated the provisions of the State Plan that were made in compliance with CAPTA, requiring particular actions be performed by a state in order to continue to receive federal funding through the federal program of CAPTA, as provided for in 42 USC §5106a, *et seq*.

571) The CAPTA violations by DHS are ongoing, knowingly and intentionally committed against Plaintiff, and which violations are part of the cause of Plaintiff's damages herein.

572) DHS did not have an adequate number of caseworkers when conducting the DHS Investigation Against Plaintiff, when performing the assessment concerning Plaintiff, and in making the founded disposition(s) against Plaintiff.

573) The DHS caseworker who made the assessment, and local DHS supervisors who signed the founded dispositions, did not review the entire record, including many photographs of child abuse to Child submitted by Plaintiff.

574)    Because DHS did not have an adequate number of caseworkers, DHS did not give the

time necessary for caseworkers to conduct a thorough investigation or assessment concerning

Plaintiff, resulting in a defective investigation and assessment, that concluded with an erroneous

May 10, 2021 DHS Decision (the 1st DHS Decision).

575)    The May 10, 2021 DHS Decision, finding *"Mental Injury"* against Plaintiff, was

appealed by Plaintiff, then confirmed by DHS – District 9 in the 2nd DHS Decision; however, the

finding of *"Mental Injury"* was overturned by the DHS Central Office in the January 19, 2022

DHS Decision (the 3rd DHS Decision).

576)    Plaintiff was able to have the *"Mental Injury"* finding overturned without any

information or documentation being provided by DHS other than the May 10, 2021 DHS

Decision itself (which is a letter 1-½ pages in length).

577)    The finding of *"Mental Injury"* caused great emotional distress to Plaintiff, and cost her

thousands of dollars in expenses and hundreds of hours of her own time in challenging the

erroneous ruling.

578)    The DHS caseworkers who conducted the investigation did not have adequate training in

child abuse investigations, or in making an assessment, or in decision-making.

579)    DHS has admitted they did not look into the entire record of the case when conducting

the investigation and making the founded dispositions.

580)    The DHS supervisors did not properly supervise Defendant Vences or Defendant Perez

when Vences and Perez were conducting the DHS Investigation Against Plaintiff.

581)    The DHS supervisors did not properly supervise Defendant Vences when Vences was

conducting the assessment concerning Plaintiff, and in the conclusions made by Defendant

Vences in the DHS assessment.

582)    Plaintiff was not advised by DHS, or any representative or DHS, of an investigation by DHS, against Plaintiff, during the time DHS was conducting its investigation against Plaintiff from April 2020 to April or May, 2021.

583)    At no time during the DHS Investigation Against Plaintiff did DHS advise Plaintiff of any legal rights or responsibilities she had.  The first time Plaintiff learned of any legal rights and responsibilities from DHS was in the May 10, 2021 DHS Decision, received by Plaintiff on May 19, 2021.

584)    Had Plaintiff known she was under investigation by DHS, at any time during the DHS Investigation Against Plaintiff and/or before the 1st DHS Decision was issued, then Plaintiff would have or could have taken different steps with knowledge of the investigation.

585)    Plaintiff did not have the opportunity to present any evidence, or rebuttal to any statements or documentation being used against her, or even to have a conversation with a DHS representative when DHS was investigating her; it was only after receipt of the May 10, 2021 DHS Decision did Plaintiff know she had been under investigation for *"Mental Injury."*

586)    Had Plaintiff known she was under investigation, she would have provided information and requested a conference with DHS officials either through her attorney, or by herself.  She was never given the opportunity because she never knew about the investigation until after the investigation was closed and the decision made from the investigation's findings and recommendations by a DHS caseworker, Defendant Vences.

587)    DHS did not provide any "immunity" to Plaintiff when she made good faith reports of child abuse or neglect, but instead in one of the "findings" against Plaintiff, DHS stated that one of the reasons for the finding of *"Mental Injury"* against Plaintiff was that a judge advised Plaintiff to "stop reporting false allegations" [of child abuse], when no judge ever told Plaintiff to stop reporting child abuse.

588)    The "AI" algorithm system utilized generally by DHS during the time period of the DHS Investigation Against Plaintiff, and when the findings were made, rather than human discernment, were likely used in the investigation and/or findings against Plaintiff, and if so, another cause for the flawed investigation, and erroneous DHS decisions against Plaintiff.  DHS has since abandoned the use of the AI system.

589)    The flawed investigation resulted in incomplete or false findings, resulting in the arbitrary and capricious Founded Dispositions which prejudiced the DHS Central Office in making the Final Order (because the investigation the Central Office relied upon was faulty).

590)    Rather than making a good faith effort to correct the mistakes found in the 2016 DHHS report and audits, Oregon DHS, here, sought to correct their mistakes by intentionally covering up a flawed investigation, covering up the lack of following the procedures outlined in the State Plan, the ORS and OAR, and other DHS guidelines, and otherwise knowingly and intentionally took steps against state law in order to create a finding against Plaintiff whether in accordance with state law or not.

591)    DHS intentionally sought to prevent Plaintiff from seeing Child, and to stop Plaintiff from obtaining additional documentation in her quest for justice for Child which turned into a quest for justice for herself, trying to clear her name and the false charges against her of *"Mental Injury"* (which was reversed by DHS' Central Office), and then for *"Threat of Harm"* (which is currently on appeal in Washington County).

592)    DHS acted violated Oregon law and the State Plan in one or more of the following:

a) Failing to properly train its employees as to conducting investigations in accordance with the State Plan, including DHS caseworkers Campbell, Vences, Perez.

b) Failing to properly supervise its employees as to conducting investigations in accordance with the State Plan, including DHS caseworkers Campbell, Vences, Perez.

c)  Failing to properly train its employees as to preparing assessments in accordance with the State Plan, including DHS caseworkers Campbell, Vences, Perez.

d)  Failing to properly supervise its employees as to preparing assessments in accordance with the State Plan, including DHS caseworkers Campbell, Vences, Perez.

e)  Failing to adequately train Defendant Vences.

f)  Failing to properly supervise Defendant Vences.

g)  Failing to adequately train Defendant Perez.

h)  Failing to properly supervise Defendant Perez.

i)  Failing to have an adequate caseworker to cases ratio in order to conduct an adequate investigation, assessment and findings.

j)  Failing to devote enough time and resources to the Investigation Against Plaintiff and Founded Dispositions.

k)  Failing to devote enough time to the DHS – District 9 local office review.

l)  Failing to devote enough time to the DHS – Central Office review and Final Order.

m) Failing to investigate and/or ignoring child abuse and neglect to Child, and instead investigated Plaintiff.

n)  Acquiescing in and/or approving CGCAC's flawed "assessment" of the child abuse, and what the CGCAC found concerning Plaintiff.

o)  Failing to advise Plaintiff of her rights when the investigation began and during the investigation.

p)  Failing to provide records to Plaintiff after the May 10, 2021 DHS Decision was issued and after Plaintiff requested records to which she had the right to receive from DHS.

593)  DHS violated Oregon law, as required in the State Plan, in one or more of the following particulars:

a)  Failing to make a *"detailed inquiry into or assessment of the safety of a child alleged to have experienced abuse"* in violation of ORS 419B.005(4)(a).

b)  Failing to immediately cause an investigation to be made to determine the nature and cause of the abuse of the child, when it receives a report of child in violation of ORS 419B.020.

c) Failing to recognize *"Suspicious physical injury"* that includes injuries reported by Plaintiff that were ignored by defendants, in violation of ORS 419B.023(1)(c).

d) Failing to recognize what is a *"suspicious physical injury"* under ORS 419B.023(2) and then failing to contact the multidisciplinary team as required and described in ORS 418.747, failing to take photographs and conduct a medical examination within 48 hours. This applies *"each time suspicious physical injury is observed"* by DHS including *"during the investigation of a new allegation of abuse."*

e) Failing to allow Plaintiff immunity, when making good faith reports of child abuse, in violation of ORS 419B.025.

f) Failing to recognize *"Physical Abuse"* as reported by Plaintiff, in violation of OAR 413-015-0115(a)(a)(C).

g) Failing to conduct a face-to-face interview with Plaintiff in its investigation of Plaintiff, in violation of OAR 413-015-0420(2)(b)(A) through (2)(b)(D).

h) Failing to *"observe the alleged victim and the parent or caregiver"* in violation of OAR 413-015-0422(3).

594)    DHS acted with deliberate indifference to Plaintiff's recognized legal interests and rights by failing to ever advise Plaintiff of her legal rights and responsibilities during the DHS Investigation Against Plaintiff.

595)    Defendant DHS owed a statutory duty to Plaintiff under the circumstances to have an investigation performed in accordance with Oregon law and the State Plan.

596)    Defendant DHS breached the statutory duty owed to Plaintiff by failing to conduct a proper investigation under Oregon law and the State Plan.

597)    Defendant DHS owed a statutory duty to Plaintiff under the circumstances to have an assessment performed in accordance with Oregon law and the State Plan.

598)    Defendant DHS breached the statutory duty owed to Plaintiff by failing to perform a proper assessment under Oregon law and the State Plan.

599)   Defendant DHS owed a statutory duty to Plaintiff under the circumstances to have decisions made in accordance with Oregon law and the State Plan, including the founded dispositions and Final Order.

600)   Defendant DHS breached the statutory duty owed to Plaintiff by failing to make proper decisions made in accordance with Oregon law and the State Plan, including the founded dispositions and Final Order.

601)   The actions of Defendants caused injury to Plaintiff through Defendants' failure to perform the required responsibilities, under Oregon law and the State Plan, to be in compliance with CAPTA, knowing their failures would harm Plaintiff, by issuing the 1st DHS Decision for *"Mental Injury"* when there was no evidence of *"Mental Injury,"* and in each subsequent decision against Plaintiff, that resulted in Plaintiff not being able to see Child, for Plaintiff to have a *"Mental Injury"* charge against her and on her record, or a *"Threat of Harm"* charge against her and on her record and all the stigmas attached, as well as legal actions against Plaintiff (i.e., the Stalking Action for example), and that Plaintiff would appeal the decisions taking her time and energy as well as the additional stress.

602)   Defendant DHS is liable for its actions taken in violation of Oregon law and the State Plan, and is vicariously liable for the actions taken in violation of Oregon law and the State Plan of its officers, employees, and agents acting within the scope of their employment or duties.

603)   Each and every act against Plaintiff in the DHS Investigation Against Plaintiff, and/or each and every act of Defendants' failure to stop the child abuse Plaintiff reported, and/or every denial of Plaintiff's right to receive DHS records, and/or every failure to advise Plaintiff of her civil rights, and/or every written decision against plaintiff, and/or every assessment made against Plaintiff, was a separate occurrence and cause of Plaintiff's injuries and damages.

604)   DHS's duty to protect Plaintiff's rights under Oregon law was non-delegable.

605)    Defendant DHS's violations of Oregon law and the State Plan was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

## EIGHTH CLAIM FOR RELIEF
### Violations of CAPTA, 42 USC §5101, et seq

606)    Plaintiff incorporates all prior paragraphs as though fully realleged.

607)    Defendant DHS violated the provisions found in the Child Abuse Prevention and Treatment Act ("CAPTA"), 42 USC §5101, et seq, requiring particular actions that a state must undertake be in order to be compliance with CAPTA, for the state to continue to receive federal funding through the federal program of CAPTA.

608)    The violations by Defendant DHS of CAPTA requirements are ongoing violations, knowingly and intentionally committed by Defendant DHS against Plaintiff, and which violations are the cause of Plaintiff's damages herein.

609)    Defendant DHS knew that it was required to properly perform particular actions to be in compliance with CAPTA, in order to continue to receive federal funding, as DHS has repeatedly certified through compliance reporting to DHHS, under the CAPTA requirement for submittal of such compliance reports, and certification of such reports, under 42 USC §5106f.

610)    Defendant DHS reported to federal DHHS that it was in compliance with the federal CAPTA program, when it was not in compliance with CAPTA in this case, and which violations of CAPTA by DHS damaged Plaintiff.

611)    Defendant DHS violated the requirements of CAPTA, in order to remain eligible for CAPTA funding through submitting certified reports, by failing to act in accordance with federal law in the following particulars:

    a) Failing to adequately train DHS caseworkers.

    b) Failing to properly supervise DHS caseworkers.

c) Failing to conduct proper investigations according to the federal law, state law, and the standards and guidelines set forth in the State Plan and/or Oregon law, the Oregon Administrative Rules, or other DHS guidelines for investigations.

d) Failing to have adequate ratio of caseworkers to new cases, in order to conduct investigations with the proper amount of time and effort necessary to conduct a thorough investigation of child abuse.

e) Failing to make proper assessments, based on facts, in accordance with Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

f) Failing to and make written founded dispositions and final orders based on evidence, in accordance with Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

g) Failing to advise Plaintiff of her legal rights and responsibilities at the beginning of its investigation, as required by Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

h) Failing to allow Plaintiff immunity status for the good faith reporting of what she believed to be child abuse based on reasonable suspicion, as required by Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

i) Failing to advise Plaintiff of her rights when the investigation began and during the investigation as required by Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

j) Failing to provide records to Plaintiff after the May 10, 2021 DHS Decision was issued and after Plaintiff requested records to which she had the right to receive from DHS as required by law.

k) Failing to properly coordinate with other governmental and private agencies, including other districts withing DHS (such as Multnomah County DHS) in the prevention and treatment of child abuse, including how DHS works with the other agencies in conducting investigations, performing assessments and making founded dispositions as required by Oregon law, the State Plan, federal law, CAPTA requirements, and all DHS guidelines.

612)  Defendant DHS, in submitting reports to DHHS as required by CAPTA, is falsely inflating numbers for things such as "re-unification rate" in order to satisfy the criticism on Oregon DHS as provided for in the 2016 DHHS Report.

613)  Rather than conduct a proper investigation, assessment and decisions, DHS sought to find against Plaintiff, and then sought to try and manufacture evidence against her. This is similar to

what happened in the Stalking Action – charge Schoene with a "crime" then try to find evidence to support what they charged. In both the DHS Case, and the Stalking Case, there is no evidence against Plaintiff for the charges brought against her, as both are false, both will be dismissed, and both have severely damaged Plaintiff.

614)    The underlying case in this matter, the DHS Admin. Case in Washington County, the CGCAC Case in Multnomah County, and the Stalking Action in Hood River County, are all inter-related with the same general set of acts, same persons involved, same witnesses, and same object of wrath for the locals in Hood River – try and find something to get rid of Plaintiff Kimberly Schoene because she was upsetting their local and corrupted system within DHS, and as it correlates to the inter-agency legal organizations and same persons in Hood River including the local District Attorney, who founded CGCAC. They all work together in Hood River, in conjunction, and here all worked against the outsider from Portland, which severely has damaged Plaintiff.

615)    Defendant DHS is liable for its misconduct and is vicariously liable for the misconduct of its officers, employees, and agents acting within the scope of their employment or duties, in violation of CAPTA.

616)    Each and every act against Plaintiff in the DHS Investigation Against Plaintiff, and/or each and every act of Defendants' failure to stop the child abuse Plaintiff reported, and/or every denial of Plaintiff's right to receive DHS records, and/or every failure to advise Plaintiff of her civil rights, and/or every written decision against plaintiff, and/or every assessment made against Plaintiff, was a separate occurrence and cause of Plaintiff's injuries and damages.

617)    DHS's duty to protect Plaintiff's rights under CAPTA was non-delegable.

618)    Defendant DHS's violations of CAPTA was a cause of Plaintiff's injury and damage, some or all of which may be irreparable damage to Plaintiff.

## PRAYER FOR RELIEF

619)    As a direct and proximate cause of Defendants' actions alleged herein, Plaintiff has

suffered economic damages in the amount of $430,000 as of May, 2023, or in an amount to be

proven at trial.

620)    As a direct and proximate cause of all Defendants' actions alleged herein, Plaintiff has

suffered non-economic damages in the form of severe emotional distress, aggravation of

Plaintiff's anxiety, nervousness, humiliation, insomnia, psychological injury, physical injury, and

other emotional harm and damages associated with the actions of all Defendants in the amount of

$1,000,000, or another amount to be proven at trial.

621)    On the First Claim for Relief, Deprivation of Fifth and Fourteenth Amendment Right of

Due Process, asserted against all Defendants, Plaintiff seeks economic damages in the amount of

$430,000 and non-economic damages in the amount of $1,000,000.

622)    On the Second Claim for Relief, Deprivation of First Amendment Right of Free Speech,

asserted against all Defendants, Plaintiff seeks economic damages in the amount of $430,000 and

non-economic damages in the amount of $1,000,000.

623)    On the Third Claim for Relief, Intentional Infliction of Emotional Distress, asserted

against all Defendants, Plaintiff seeks economic damages in the amount of $430,000 and non-

economic damages in the amount of $1,000,000.

624)    On the Fourth Claim for Relief, Negligent Infliction of Emotional Distress, asserted

against all Defendants, Plaintiff seeks economic damages in the amount of $430,000 and non-

economic damages in the amount of $1,000,000.

625)    On the Fifth Claim for Relief, Negligence Against State, asserted against all Defendants,

Plaintiff seeks economic damages in the amount of $430,000 and non-economic damages in the

amount of $1,000,000.

626)    On the Sixth Claim for Relief, Negligence *Per Se* Against State, asserted against all

Defendants, Plaintiff seeks economic damages in the amount of $430,000 and non-economic

damages in the amount of $1,000,000.

627)    On the Seventh Claim for Relief, Violations by DHS of Oregon Law and the State Plan,

asserted Defendant DHS, Plaintiff seeks economic damages in the amount of $430,000 and non-

economic damages in the amount of $1,000,000.

628)    On the Eighth Claim for Relief, Violations of CAPTA, 42 USC §5101, et seq, asserted

against Defendant DHS, Plaintiff seeks economic damages in the amount of $430,000 and non-

economic damages in the amount of $1,000,000.

629)    On all claims, Plaintiff's legal costs and expenses.

630)    Plaintiff seeks further necessary or proper relief as the Court may deem equitable and

just.

Dated: July __11__, 2023

Kimberly Marie Schoene, Plaintiff Pro Se
1801 NW Upshur, Suite 100
Portland, OR 97209
(503) 713-7000
hissmallvoice@gmail.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on date set forth below I filed **FIRST AMENDED**

**COMPLAINT,** via hand-delivery, to:

United States District Court of Oregon – Portland Division
**Mark O. Hatfield U.S. Courthouse**
1000 S.W. Third Ave.
Portland, OR 97204

I further certify that on date set forth below I served the **FIRST AMENDED**

**COMPLAINT**, via email to the following:

David Hall
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201

david.hall@doj.state.or.us

Attorney for Defendants

Dated: July 11, 2023

Kimberly M. Schoene, Petitioner
1750 SW 88th Avenue
Portland, OR 97225
(503) 713-7000
hissmallvoice@gmail.com